TONKIN CORPORATION OF CALIFOR-
NIA, dba Seven-Up Bottling Company
of Sacramento, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 21130.

United States Court of Appeals
Ninth Circuit.

March 29, 1968.

Rehearing Denied May 14, 1968.

---

M. B. Jackson (argued), Kyle D. Brown, of Hill Farrer & Burrill, Los Angeles, Cal., for appellant.

Elliott Moore (argued), Linda Sher, Attorneys, N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., for appellee.

Before CHAMBERS and HAMLEY, Circuit Judges, and WOLLENBERG, District Judge.

**WOLLENBERG, District Judge:**

This is a petition for review of the Supplemental Decision and Order of the National Labor Relations Board pursuant to Section 10(f) of the National Labor Relations Act (29 U.S.C. § 151 et seq.). The Board has cross-petitioned for enforcement of its order. 29 U.S.C. § 160(e). This Court has jurisdiction pursuant to Section 10(f), supra.

Petitioner is engaged in the business of bottling and distributing soft-drink products, including "Seven-Up", in the Sacramento area. The "Seven-Up Employees Union" [hereinafter referred to as the Independent Union] had been the bargaining representative for many years for petitioner's plant employees and route salesmen. It was formed originally by employees of petitioner in order to keep the Teamsters Union from gaining any representation. Its meetings were informal, infrequent, and largely social. It has never filed a grievance with petitioner. At the time of the events involved in the present dispute, a contract was in existence between petitioner and the Independent Union which was to expire on April 1, 1963.

Early in 1963, members of the Independent Union began discussing terms which they wanted incorporated into the new contract. These terms were presented to petitioner. A meeting was called for Friday, March 29, by petitioner to explain its position to the Independent Union. At the meeting, petitioner's president, Harry Tonkin, proposed a wage increase of $3.00 per week and offered to pay the men time and one-half for overtime. He also stated that the company would match any increase in wages paid by other local soft-drink companies. Sick leave benefits, paid holidays, and vacations, bonuses, and pension plans were also discussed at the meeting.

Tonkin stated that he was aware of Teamster organizational activities among his employees and that he wanted to negotiate with the Independent Union rather than the Teamsters.[1] Several of the men present at the meeting testified

1. The Board concedes that Tonkin was mistaken in asserting that Teamster activities were occurring on March 29, since it is undisputed by the record that the first contact had by the employees with the Teamsters was on the following Sunday, March 31. However, such statements are relevant in showing petitioner's motivation with respect to the subsequent events of April 1.

at the Board hearing that Tonkin stated that the men would not be able to go to work the following Monday unless a contract was signed.

The meeting was adjourned so that the men could discuss the company's proposals. It was agreed that representatives would meet later with the company to relate the results of the meeting. There was a general consensus to accept the proposals in view of the overtime and "most favored nation" terms. No formal vote was ever taken by the men since many left the meeting before one could be taken.

A group of the employees then went to the offices of the company to report the results of their meeting. They informed management that the men had agreed to accept the wage increase and the proposal to pay overtime if the company would agree to match any further increase in wages of similar local industries, particularly the local Pepsi-Cola distributor who was then in negotiations with its employees. Tonkin stated that he would find out about any increase in that area. Tonkin found out the next day that Pepsi and its employees were dead-locked over wages and reported this to the Independent.

At the Friday evening meeting, the management-Union group also talked about paid holidays and sick leave. Tonkin orally agreed that a man's birthday would be considered a paid holiday, but did not want to put this term into the written contract. He also stated that the men would not be docked when they were sick, but again did not want to put this term in writing for fear of possible abuses.

The subject of bonuses was discussed, with Tonkin agreeing to look into the matter further. Regarding the disability and pension plan, Tonkin informed the men that he could not afford to change the plan, but that in the past year management had instituted a better plan than before.

When the meeting broke up, the parties shook hands. The Independent informed management that they would have to submit the agreement for ratification to their full membership and that a meeting would be held Monday morning, April 1, for that purpose.

On Sunday, March 31, several of the members of the Independent attended a meeting at the home of a Pepsi-Cola employee where a representative of the Teamsters was present. The men from the Independent signed authorization cards for the Teamsters, and later in the day solicited several other of petitioner's employees to sign such cards.

When the men reported for work on Monday morning, April 1, they found that the gate to the adjoining parking lot where petitioner's trucks were kept was locked. At the hearing before the Board, Tonkin testified that he did not unlock the gate in the morning because he wanted to insure that early starters would not leave on their routes without being notified of the Union meeting to be held for ratification of the contract.

The men had an informal meeting to discuss the ratification and rejected the contract by a vote of nine to eight. Tonkin was informed of this and expressed dismay. At some time during this period, Tonkin stated that the men would not be able to go to work until a contract was signed, "We have this contract and if any of the union officials don't want to go to work we will have a new election and get new plant union officials".

A second vote was taken by the Union with the result the same as the first. In the interim, more authorizations were solicited and given to a Teamster representative who was in a car parked nearby.

Tonkin was informed of the results of the second vote. He testified at the Board hearing that he informed the men that he had consulted with his attorney who informed him that a contract had been formed on Friday evening and that the Union was obligated to sign it on Monday. The Union met again and the men filed slowly back into the plant. Barwise, one of the employees, signed

the contract as Secretary-Treasurer of the Independent Union. Barwise asked if any reprisals would ensue as a result of his Teamster activity. He was informed by Tonkin that no action would be taken against any employee.

On April 2, the Teamsters filed a petition with the Board for a representative election among petitioner's employees. A letter was received by petitioner and the Independent on April 5 from the Board informing them of the representation petition and asking if they would send copies of the bargaining contract, if any, they had entered into.

The Union's president, Hill, asked management after work on April 5, if they had received the letter from the Board. Hill stated that he had no means by which to make copies of the contract. Tonkin stated that he would send copies in for the Union if they so desired. Hill replied that he would contact the Union's attorney. Instead, the Union contacted a representative of the Teamsters who informed them that it made no difference whether they sent a contract in. Hill informed management that as far as the Union was concerned, management had complete discretion in either sending in a copy for the Union or not. Tonkin sent a copy in for management and also one for the Union, giving the Union's return address.

The original unfair labor practice charge was filed April 5, 1963. On April 9, Barwise was discharged. The amended charge was filed May 29, alleging unlawful discharge of Barwise.

The Board's complaint charged petitioner with violations of Section 8(a) (1), (2), and (3) of the Act. A hearing was held, and the Trial Examiner issued his decision, finding petitioner in violation of the above-mentioned sections of the Act. The Board adopted the findings of the Examiner. Petitioner was ordered to withdraw and withhold recognition of the Union until such time as it may be certified by the Board. It was also ordered to cease from giving effect to the April 1 contract.

Following this decision, the Board petitioned this Court for enforcement of its order. N.L.R.B. v. Tonkin Corporation, 352 F.2d 509 (9th Cir. 1965). We affirmed the decision of the Board in respect to its finding that Barwise had been discharged in violation of Section 8(a) (1) and (3) of the Act, stating:

"However, respondent's knowledge of Barwise's efforts on behalf of Teamster representation, coupled with the timing of the discharge, persuade us that the Board could reasonably have drawn the inference it did from the facts in evidence and all surrounding circumstances, notwithstanding the existence of justifiable grounds which, under other circumstances, might have permitted dismissal." 352 F.2d 509, at 511, supra.

With respect to the Board's order on the lockout issues, we remanded to the Board to reconsider its decision in light of the subsequent decision of the Supreme Court in American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). In this regard, we stated:

"Without deciding whether respondent in fact locked out its employees as alleged, we note at the outset that the order sought to be enforced was issued before American Ship was decided, and at a time when the Board held the view that, absent special circumstances not present here, a 'lockout' for the purpose of exerting economic pressure to secure more favorable contract terms, after a bargaining impasse had been reached, was an unfair labor practice within the meaning of § 8(a) (1), (3) and (5) of the Act. [Cases omitted].

"In American Ship, the Court decided that it was not unfair labor practice, within the meaning of § 8(a) (1) and (3), for an employer temporarily to lock out his employees with the sole object of applying economic pressure to support a legitimate bargaining position, after an impasse in collective-bargaining negotiations had been

reached. And the Court specifically stated: 'This is the only issue before us, and all that we decide.' [American Ship Building Co. v. N.L.R.B., supra, 380 U.S. at 308, 85 S.Ct. at 962.]" 352 F.2d at 510.

In its Supplemental Decision, the Board found *American Ship* not to be controlling because of the unlawful purpose it attributed to petitioner in locking out its employees. It relied upon Tonkin's statements at the March 29 meeting and on April 1, coupled with his subsequent conduct in sending in a copy of the contract to the Board on behalf of the Union, to show that petitioner's purpose in locking out its employees on April 1 was to prevent its employees from having a free choice in determining its bargaining representatives in violation of Section 8(a) (1), (2), and (3) of the Act.

We note that in *American Ship,* the Court emphasized that there was "no allegation that the employer used the lockout in the service of designs inimical to the process of collective bargaining. There was no evidence and no finding that the employer was hostile to its employees' banding together for collective bargaining or that the lockout was designed to discipline them for doing so." *American Ship,* supra, 380 U.S. at 308–309, 85 S.Ct. at 962.

The record in the instant case supports the Board's finding that in keeping the gates locked on April 1, petitioner's purpose was to prevent its employees from freely determining their bargaining representative and otherwise keeping the Union subservient to it as a bargaining representative. Tonkin's statement at the March 29 meeting to the effect that he did not want to bargain with the Teamsters shows this purpose,[2] as well as his statements on March 29 and April 1 that nobody would work unless a contract was signed. His subsequent conduct in mailing a copy of the contract on behalf of the Union to the Board supports the Board's finding that petitioner wanted to keep the Teamsters from representing his employees.

Petitioner asserts that a contract was in fact made on the evening of March 29; hence, its conduct on April 1 was merely an attempt to secure the fruits of this contract. If a contract was in fact made on March 29, why was petitioner so concerned to have his employees sign it on Monday morning, unless he wanted to use the signed contract to prevent the Teamsters from organizing his employees? Moreover, petitioner's subsequent conduct in discharging Barwise, affirmed by this Court, supports the view that petitioner's purpose on April 1 was not to secure the fruits of an agreement allegedly made, but rather to keep the Teamsters from organizing his employees. Even his own testimony before the Board shows that petitioner did not want the Teamsters to represent his employees. Hence, he explained that while he did not tell the men that he did not want to negotiate with the Teamsters; rather, he pointed out the disadvantages to them of joining that organization with the possibility that they would have to join strikes when they had no grievance with their employer.

On the record before us, we cannot say that there is not substantial evidence to support the Board's findings that petitioner committed unfair labor practices in violation of Section 8(a) (1), (2), and (3) of the Act.

Accordingly, the petition for review is denied. The Board's cross-petition for enforcement of its order is granted, and said order is to be enforced in all respects.

---

2. See Note 1, supra.