OIL, CHEMICAL AND ATOMIC WORK-
ERS INTERNATIONAL UNION, LO-
CAL 4-243, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Allied Chemical Corporation, Intervenor.

No. 19692.

United States Court of Appeals.

District of Columbia Circuit.

Argued March 10, 1966.

Decided May 24, 1966.

Mr. Mozart G. Ratner, Washington, D. C., for petitioner.

Mr. Marcus W. Sisk, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Melvin Pollack, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. Victor A. Sachse, Baton Rouge, La., with whom Mr. Hugh B. Cox, Washington, D. C., was on the brief, for intervenor.

Before WILBUR K. MILLER, Senior Circuit Judge, and MCGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is before us on a petition to review an order of respondent National Labor Relations Board (Board) dismissing a complaint based on charges filed by petitioner (hereafter the Union).[1]

Union Texas Petroleum, a division of Allied Chemical Corporation (respondent before the Board, intervenor before this court and hereafter the Company), purchased from Texas Gas Corporation (Seller) its Winnie, Texas gasoline refinery. It is undisputed that the Company intended at all times to take over the plant in a shut-down condition, and to convert this refinery to a different production focusing on petro-chemical stocks.[2] In view of the Company's plan to convert the refinery into a petro-chemical plant, the Union does not contend that the Company was a "successor" to the Seller, Texas Gas. NLRB v. Alamo White Truck Service, 273 F.2d 238 (5th Cir. 1959). Nor does the Union contend that the Company was affirmatively obligated to hire Seller's employees.

Although title to the plant passed to the Company on December 31, 1962, the refinery plant was not actually shut down until February 14, 1963. This, the Board found, was done by the Company solely as an accommodation to Seller. For tax reasons Seller wished to complete the transfer of title in 1962. The Company did not wish to take over the plant on December 31, 1962, as its conversion plans were not then ready. What finally evolved was a contract whereby Seller would continue to operate the plant after passage of title on December 31, on a cost-plus-fixed-fee basis.

The case is concerned with what happened in 1963. The Trial Examiner found that the Company violated § 8(a) (5) of the National Labor Relations Act by refusing to bargain with the Union during the period beginning January 1, 1962, and violated § 8(a) (3) by the mass discharge on February 14, of 72 hourly paid employees who had been employees of Texas Gas. The Trial Examiner found that these employees were discharged by the Company, as their actual employer or co-employer, because of their membership in the Union.

The Board reversed the Examiner, holding that the record contained insufficient evidence to warrant a finding that, during this period, the relationship between the Company and Seller was one of joint employers, or co-employers, or agency, which would constitute the Company as the employer of the employees at the Winnie plant and obligate it to bargain with the Union representing those employees.

The Board further found that, in accordance with the Company's plan, which was never altered, the plant was shut down and all of the production and maintenance employees were terminated prior to the Company's physical take-over of the premises; that the shut-down of the plant or layoff of the production and maintenance employees was not motivated by the Company's anti-union animus; and that the parties consummated their sale agreement in the manner bargained for and with the legitimate business interests of both in mind.

█ Our task is to determine whether the Board's findings are supported by substantial evidence on the record taken as a whole, including the Trial Examiner's decision.[3] He had a very different view

1. Union Texas Petroleum, 153 N.L.R.B. No. 71 (1965).

2. This conversion operation was budgeted at some $7 million—as compared with the $3 million paid for the Winnie plant as is.

3. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 492–497, 71 S.Ct. 456 (1951).

of the case. He found that the evidence taken as a whole pointed to a discriminatory design "of deliberately terminating and refusing to employ the hourly paid employees represented by the Union, so as not to be encumbered by an obligation to deal with the Union."

In supporting his findings, the Examiner emphasized evidence which he characterized as showing the experience of the Union members and the lack of experience of the employees brought in by the Company; the non-union situation at the Company's other plants; the Company's exclusion of all pending employment contracts from its purchase of the plant, and its subsequent hiring of substantially all the former personnel, with the significant exception of those represented by the Union; the use of Company procedures which in his view were calculated to discourage the employees represented by the Union; the Company's claim of impartial selection tests in hiring new employees being undercut by an inordinate and inexplicable disparity in the passing scores given to its previous employees as compared with the group represented; and the Company's ultimate employment of only 11 represented by the Union out of 37 hourly employees on its payroll in June 1962, reflecting effective destruction of the Union's majority in the original unit of 72 employees.

The subject of discrimination in the June 1962 hirings pervades the Examiner's decision, but is not commented on in the Board's opinion. However, the complaint did not charge discrimination in the June hiring. The Board's counsel made it clear that this was not claimed as a substantive unfair labor practice. It was at most evidentiary, in terms of motivation, concerning the unfair labor practices charged by the Union, alleged by Board's counsel, and found in the Trial Examiner's decision.

The Examiner's key finding was that the Company was the employer or co-employer of the Union group during January and the first half of February. His decision was predicated on a piercing of the form of the operating agreement, whereby Seller was referred to as an "independent contractor * * * free of control or supervision of Company as to means and methods of performing" the work, and as sole employer of the employees. The Examiner found that the Company "possessed and exercised in a substantial degree control over the manner and means of the day to day performance under the operating agreement" and that the "operating agreement was a sham."

The Board specifically considered the presence and activities of representatives of the Company at the plant, which had been stressed by the Examiner, and found that they did not engage in such activities or possess such authority over operations as to warrant the Examiner's finding. The Board found that Quinn, the Company's area superintendent, did no more than pass on expenditures over $500, which was considered appropriate to avoid major repairs that would result in waste upon the undertaking of the conversion. Herrington, the Company's traffic manager, at the Houston sales office, only acted in performance of his function at that office, which was divorced from the Winnie production and maintenance facilities.[4]

In our opinion there is substantial evidence in the whole record, including the Examiner's decision and findings, supporting the finding of the Board. For the most part the problem is one of drawing inferences from evidentiary facts. We may assume for present purposes that there was substantial evidence to support the findings of the Examiner, even though these were based on circumstantial evidence. The Board is, however, the agency entrusted by Congress with the responsibility of making findings in cases arising under the statute, and it is not precluded from reaching a result contrary to that of the Examiner when

4. It is not contended that the fact that the Company's Houston sales office took over the sales functions of Seller estab-lishes a relationship of the two companies at the Winnie plant.

there is substantial evidence in support of each result. Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 351 F.2d 824, 828 (1965), cert. denied *sub nom.* WWIZ, Inc. v. FCC, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (April 4, 1966).

The Board cannot satisfy its statutory function merely by stating that it disagrees with a trial examiner. It must make clear the basis of its disagreement. Its decision must be presented in such form as to enable this court to pass intelligently on that decision, and to determine whether it is rationally related to findings and supported by substantial evidence. Retail Store Employees Union v. NLRB, 123 U.S.App.D.C. ——, 360 F.2d 494 (July 13, 1965). In our opinion, the Board properly discharged this function. Its decision sets forth and makes clear that the Examiner's decision was given attentive consideration. The Board did not take up every evidentiary item discussed by the Examiner. No such requirement can reasonably be implied. It suffices that the Board addressed itself to key items of evidence which were crucial in terms of the Company's alleged status as employer, and fairly indicated the basis on which it was drawing inferences contrary to those of the Examiner.

This is not a case significantly affected by demeanor evidence, although the Examiner's opinion begins with a formal recitation that it is based on the whole record, including demeanor of witnesses. As we see the case, the differences between the Board and the Examiner were basically as to the inferences to be drawn from the evidentiary facts and were rooted in differences in approach.

The Examiner's approach was essentially that the Company's program probably, almost obviously, was ascribable to anti-union motivation. The Board's approach was that the Company's action was governed by legitimate business considerations to take over a completely shutdown refinery before beginning the huge conversion to a petro-chemical plant, and that this business purpose underlay its contract retaining Seller as a bona fide independent contractor operating the refinery prior to shut-down date.

 The difference in approach relates to matters where the presumptively broader gauge and experience of members of the Board have a meaningful role. The Board members may or may not be sounder in their inferences and findings than the Examiner, but it is they who have been given the statutory responsibility. We cannot say that their findings are irrational or unsupported by substantial evidence.

Affirmed.