**HOUCHENS MARKET OF ELIZABETH-TOWN, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16948.

United States Court of Appeals
Sixth Circuit.

March 24, 1967.

Ray B. Buckberry, Jr., Bowling Green, Ky. (Jerry L. Moore, Bell, Orr & Reynolds, Bowling Green, Ky., on the brief), for petitioner.

Theodore J. Martineau, Atty., N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before CELEBREZZE, PECK and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is a petition for review of a decision of the National Labor Relations Board in which the Board found that Houchens Market of Elizabethtown, Inc., hereinafter referred to as the Company, violated Section 8(a) (5) and (1) by refusing to bargain in good faith with Local 227 of the Amalgamated Meatcutters and Butcher Workmen of North America, AFL-CIO, hereinafter referred to as the Union. The National Labor Relations Board has cross-petitioned for enforcement of its Order.

The essential facts are uncontroverted. The Union, on June 12, 1964, was certified by the Board as the exclusive bargaining agent for Company employees. Between the period of June 30, 1964 and January 13, 1965, representatives of the Company and the Union met fourteen times in negotiating sessions. During the course of these negotiating meetings Robert G. Nutter, an officer of the Union, made statements to the effect that any contract proposal or recommendations would be subject to approval by the employees. The record further discloses that on November 5, 1964, the Company presented to the Union a written contract containing the counter-proposals of the Company. After discussion, the Union agreed to all the terms contained in the Company's proposed agreement, but requested that five additional items be included in the contract. The Company took them under advisement, and at a later date, through their Counsel Orr, informed the Union Counsel Segal they would accept two of the five proposals. That as to the remaining three proposals the parties would hold another bargaining session, scheduled for February 9, 1965.

On February 8, 1965, Segal called Orr and informed him that the Union would abandon its three remaining proposals. Orr at the close of the conversation for the first time affirmatively stated that the contract would have to be submitted to the employees for approval. Segal objected and responded that employee approval was "an internal matter" of the Union which "the Company had no right to get into", and that the Company was committing an unfair labor practice.

The same day, Segal addressed a letter to Orr in which he reiterated that the Union accepted the contract proposals as amended, and included therein text of language necessary to effect the changes. In addition, Segal stated:

"As I told you, I felt your condition was not proper and usurped the duty and responsibility of the certified collective bargaining agent, Local 227."

Orr, in turn, wrote Segal on February 9, 1965. In his letter Orr referred to the telephone conversation of the previous day and confirmed the Company's acceptance of two of the Union's proposals and rejection of the other three. Orr's letter went on to state:

"This will also confirm our conversation of yesterday with you to the effect that the Company desired and made as an item of bargaining the approval of the contract by a majority of the employees comprising the bargaining unit, and I suggested and am here offering a counterproposal styled Article XVII, Ratification, to become a part of the Company's Counterproposal of November 5, as amended."

The text of the counterproposal provided that the contract would not be executed by the Company until it had been ratified by a majority of the employees by either

their signing a statement or by a secret ballot. Orr closed his letter as follows: " * * * the representative of the Union having heretofore conducted the thirteen meetings prior to your coming into the negotiations on January 13, 1965, has stated that any contract agreed upon would necessarily be approved or ratified by a majority of the employees constituting the bargaining unit, and the Company is of the opinion that the approval of the agreement * * * by a majority of the employees will be beneficial to the employees, the Company and the Union and, therefore [our counterproposal] should be included in the contract."

The Company's proposed contract dated November 5, 1964, as amended by the two Union proposals subsequently agreed upon, contained no mention or suggestion of employee ratification. Nutter, who had been negotiator for the Union prior to the January 13, 1965, meeting, had verbally announced during previous bargaining meetings that "any contracts or any proposed contracts recommended by him would have to be approved by the employees". The Company's negotiators had not responded to Nutter's statements.

Union Counsel Segal, after receiving Orr's letter of February 9, 1965, telegraphed Orr on February 11th, as follows:

"Even though Houchens Market of Elizabethtown and Local Union 227 Meat Cutters have agreed on all terms of a collective bargaining agreement the Company now informs the Union that it will not execute said agreement until it has been ratified or approved by a majority of the employees in the bargaining unit. The Union feels that the Company's position constitutes unfair labor practice, and without in any way waiving that unfair labor practice, the Union intends to submit said agreed contract to the MPHS, by this action the Union in no way waives its right to contest the Company's action or to seek redress under the Labor Management Relations."

After hearing no further response from the Company, the Union, the following week, on February 15, 1965, initiated the instant unfair labor practice proceeding.

Upon the foregoing facts, the Board found that the Company refused to bargain in good faith with the Union, thereby violating Section 8(a)(5) and (1) of the Act, by insisting, on February 8, 1965, and thereafter, on employee ratification as a condiltion precedent to execution of the contract the parties had agreed upon. The Board's order requires the Company to cease and desist from the unfair labor practice, and requires the Company, if requested by the Union to sign the contract agreed upon by the parties and to post an appropriate notice.

The sole issue presented on appeal to this Court is whether or not the Company's insistence, after February 8, 1965, that the contract agreed upon would be approved or ratified by a majority of the employees constituting the bargaining unit, constituted an unfair labor practice.

The Board, basing its finding on Section 8(d) of the Act, so found.

The relevant provisions of Section 8(a)(5) make it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * *." Section 8(d) defines collective bargaining as follows:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."

Commenting on the force of these provisions, the Supreme Court said in National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958):

"Read together, these provisions establish the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment * * *.' The duty is limited to those subjects, and within that area neither party is legally obligated to yield. National Labor Relations Board v. American National Insurance Co., 343 U.S. 395 [72 S.Ct. 824, 96 L.Ed. 1027]. As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree. The company's good faith has met the requirements of the statute as to the subjects of mandatory bargaining. But that good faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining.

\* \* \* \* \* \*

"This does not mean that bargaining is to be confined to the statutory subjects. Each of the two controversial clauses is lawful in itself. Each would be enforceable if agreed to by the Unions. But it does not follow that, because the company may propose these clauses, it can lawfully insist upon them as a condition to any agreement."

■ The credibility of witnesses and the reasonable inference to be drawn from the evidence are matters for determination by the Trial Examiner and the Board. National Labor Relations Board v. Bendix Corp., 299 F.2d 308 (C.A.6, 1962); National Labor Relations Board v. Interurban Gas Corp., 317 F.2d 724 (C.A.6, 1963); National Labor Relations Board v. Plaskolite, Inc., 309 F.2d 788 (C.A.6, 1962). Considering all the facts, we find there was substantial evidence to support the Board's finding that the Company committed an unfair labor practice by insisting the contract agreed upon be approved by a majority of the employees constituting the bargaining unit.

The Company and the Union met fourteen times between June 30, 1964 and January 13, 1965. The Company's proposed contract of November 5th, which was accepted by the Union after adoption of two Union amendments, contained no proposal of employee ratification. The Company now says it relied upon the statements of Nutter, the Union representative. The record is devoid of any testimony that the Company either relied upon Nutter's statements, or in turn affirmatively responded to them so as to make them part of the agreement. There was no reference to this provision by the Company until all the other terms of the contract were agreed upon. The Company did not raise the issue until February 8, 1965, in its 'phone conversation with Segal. There was substantial evidence to support the finding of the Board that all the terms of the contract had been agreed upon when the Company insisted on employee ratification of the contract.

The Company also relies on promissory estoppel. The Company maintains that in order to avoid injustice, this Court should enforce even gratuitous promises when it is evident that the promisee relied upon the representations and that a failure to enforce the promise would result in a detriment to the promisee.

■ While we find no fault with this general statement, we find it has no application to the facts in this case. If the ratification provision was important to the Company, and if the Company relied on the Union's statements that the contract would be submitted to the employees, then such provision would have been incorporated in the Company's proposed contract of November 5, 1964. As stated previously, the record is devoid of any evidence which would sustain the Company's position that it relied upon, or accepted Nutter's statements, therefore we fail to see any detriment.

■ The Company, by insisting after all the other terms of the contract were agreed upon, that the contract be approved or ratified by a majority of the employees, was attempting to bargain, not with respect to "wages, hours and other terms and conditions of employment", but with respect to a matter which was exclusively within the internal domain of the Union. Members of a Union have the right to determine the extent of authority delegated to their bargaining unit. It is within their province to determine wheher or not their bargaining unit may enter into a binding contract with or without membership ratification. It is not an issue which the Company can insist upon without mutual agreement by the Union, any more than the Union can insist that the contract be submitted to the Board of Directors or stockholders of the Company. The Union, by virtue of its certification as exclusive bargaining agent, was empowered by its members to make agreements on behalf of the employees it represented without securing the approval of those employees.

We agree with the decision of the Fourth Circuit in National Labor Relations Board v. Darlington Veneer Co., 4 Cir., 236 F.2d 85, at page 88, wherein the Court stated:

> "The purpose of collective bargaining is to fix wages, hours and conditions of work by a trade agreement between the employer and his employees. N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 638. This can be done satisfactorily only if a bargaining agent is selected to represent all the employees with full power to speak in their behalf. The purpose of the statute would be largely frustrated if the results of bargaining must be submitted to a vote of the employees, with all the misunderstandings and cross currents that would inevitably arise in an election of that sort. * * *
>
> "We do not mean to say that the ratification and nullification provisions would not be legal and valid if agreed upon by the parties, nor that the mere advancing of such proposals is of itself an unfair labor practice. Cf. Allis Chalmers Mfg. Co. v. N. L. R. B., 7 Cir., 213 F.2d 374. We think, however, that the insistence upon such provisions as a condition of entering into any agreement is so unreasonable when objected to by the other party as to furnish of itself a sufficient basis for the finding by the Board of failure to bargain in good faith, * * *."

The petition of the Company to set aside the order of the Board is denied, enforcement of the Board's Order is granted.