OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, LOCAL 3-89 AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Union Carbide Corporation, Intervenor.

No. 21289.

United States Court of Appeals District of Columbia Circuit.

Argued March 22, 1968.

Decided Dec. 3, 1968.

Mr. David D. Johnson, Charleston, W. Va., with whom Mr. Richard P. Lawlor, New York City, was on the brief, for intervenor.

Before BURGER, TAMM, and ROBINSON, Circuit Judges.

## BURGER, Circuit Judge:

This case reaches us on a petition to review a Decision and Order of the National Labor Relations Board [1] dismissing a complaint by Oil, Chemical and Atomic Workers International Union, Local 3–89, AFL–CIO charging Union Carbide Corporation, Mining and Metals Division, with violations of Section 8(a) (1), (3), (5), and (d) of the National Labor Relations Act, as amended.[2] Specifically, Local 3–89 claimed that Union Carbide, during May through July 1966 negotiations for a new basic contract, had insisted, to the point of impasse, that the Union accept a Company proposal on a nonmandatory bargaining subject, and that the Company had locked out its employees to pressure the Union into agreeing to the nonmandatory item.

The petitioner, Local 3–89 has been the collective bargaining representative for the approximately 1200 production and maintenance employees at the Alloy, West Virginia plant of Union Carbide's Mining and Metals Division [3] for over twenty-five years, and has negotiated and executed numerous prior collective bargaining agreements with the Company. Since 1950, Union Carbide and Local 3–89 have been parties to two concurrent labor agreements, one—the "basic" agreement—covering general subjects of wages, hours, and working conditions, and a second one—the "pension-insurance" agreement—which cov-

Mr. Jerry D. Anker, Washington, D. C., with whom Mr. James J. Cronin, Washington, D. C., was on the brief, for petitioner.

Mr. Gary Green, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.

1. 165 NLRB No. 26 (June 9, 1967).
2. 29 U.S.C. § 158(a)(1), (3), (5) & (d) (1964).
3. The Mining and Metals Division is one of Union Carbide's major divisions and is comprised of five plants: Alloy, West Virginia, Marietta, Ohio, Ashtabula, Ohio, Portland, Oregon, and Sheffield, Alabama. All of these plants are organized, with the United Steelworkers representing employees at the Ashtabula, Portland, and Sheffield plants. The Oil, Chemical and Atomic Workers Union represents employees at Alloy and Marietta.

ers pensions and group life and hospitalization insurance. Although the provisions of these agreements run concurrently, the basic agreement traditionally has a two-year term while the pension-insurance agreement extends over a five-year period.[4]

Prior to the initiation of the negotiations which generated these unfair labor practice charges, the company, in January 1965, had granted improvements in pension and insurance coverage to its non-union employees.[5] Thereafter, in December 1965, the Company announced that it was establishing for its non-union employees a substantially improved vacation program which would take effect in 1966. In response to this latter announcement by the Company,[6] the Union requested a bargaining session to consider the possibility of revising the vacation plan embodied in the current basic agreement, even though the basic Union contract was not due to expire until July 1966, nearly six months later. The Company agreed to such a meeting, and offered to amend and improve both the bargaining unit's vacation plan and its pension insurance plan as well. In exchange, however, the Company wanted the newly-revised pension-insurance agreement to be made effective for a full five year term. That proposal was rejected by the Union.[7]

Against this background, we can turn to the May 1966 negotiations directed at

4. The basic and pension-insurance agreements in force at the time the 1966 negotiations in question were initiated illustrate this pattern, for the basic agreement had an expiration date of July 2, 1966 whereas the pension-insurance agreement then in effect would not expire until July 2, 1967.

5. This procedure of unilaterally initiating improvements in the pension-insurance coverage was not new in this collective bargaining context. Both Company and Union witnesses testified that such a change often led to requests by the Union or Company for discussions which might produce equivalent changes in the agreement covering Union personnel. The parties, therefore, did not feel inflexibly bound by an existing agreement, and such interim negotiations frequently led to revisions in agreements which were neither ready to expire nor the subject of current renegotiation.

6. Evidently the Union's failure to pursue possible renegotiation and revision of its pension-insurance agreement in response to the Company's January improvements in pension and insurance benefits was the result of calculation and not oversight. Although such a request by the Union would have been in the usual course, see note 5 supra, Local 3–89 and several other unions which represented Union Carbide employees, known collectively as the Carbide Nationwide Council, had decided to initiate a plan leading to collective negotiation with the Company, particularly with respect to pension-insurance agreements which would expire in 1967. In this way they hoped to muster greater bargaining strength. This program was guided and assisted by the Industrial Union Department (IUD) of the AFL-CIO, which maintains a staff for the purpose of assisting its affiliated unions in such matters.

7. Such an agreement would have had the obvious effect of removing Local 3–89 and the Alloy, West Virginia plant from the proposed collective front which would face the Company in the renegotiation of any pension-insurance agreements in 1967. See note 6 supra. This was the reason the Company was willing to offer improved vacation benefits for this concession, and, in its brief, the Union acknowledges that this is precisely why it declined to accept the proposition. Shortly thereafter, at a meeting of the Carbide Council in Washington, D.C. on February 25, 1966, Local 3–89 and other locals dealing with Union Carbide discussed the aforementioned proposal which the Company also had presented at its other plants. The result was a "unanimous decision" by these Unions "to turn down these Vacation changes if they are tied to the acceptance of the 1965 Pension and Insurance changes which the Company offered which also extend those agreements for an additional five years." Joint Appendix 202 [hereinafter J.A.]. Moreover, another resolution, subsequently adopted by Local 3–89, provided that "[e]ach local participating in 1966 coordinated bargaining will consult the IUD–Union Carbide Steering Committee, and consider its views and advice before accepting any final Company proposal." [J.A. 204]

formulating a new basic agreement between Union Carbide and Local 3–89 at the Alloy, West Virginia plant. Following the Union's timely request for negotiation of a new contract, the parties began to meet on May 18, 1966.[8] At this meeting procedural ground rules were established and the Union submitted a list of 54 specific demands for the Company's consideration. These proposals were discussed in ensuing meetings, and by June 1 the Company had responded in writing to all of the Union's non-economic demands.[9]

On June 2, one month to the day from the expiration date of the basic agreement, the Company presented its first "package" proposal. If accepted, such a "package" offer would have resulted in a termination of negotiations on outstanding specific proposals and would have terminated the bargaining. Basically, this package included: adoption of seven of the Union's previously submitted proposals, a wage increase averaging approximately fifteen cents per hour over two years, an additional paid holiday, the improved vacation plan which had been given to non-union employees in December 1965, and a five year improved pension-insurance plan equivalent to the one given to non-union employees in January 1965. Following the Company's explanation of its proposal, the Union did not protest the inclusion of the pension-insurance subject in the bargaining pro-

posal. To the contrary, the Union negotiators questioned its provisions and application in such detail that Company negotiators felt it necessary to call their pension-insurance expert into the meeting to "field" some of the inquiries. Nevertheless, the Union finally rejected the proposal, and on June 10, filed an unfair labor practice charge against the Company for "Failure * * * to bargain on vacation plan without making it contingent upon Union accepting Company pension and insurance plans which are not open for negotiations until 1967." [10]

The parties continued to review the 54 individual proposals made by the Union at subsequent meetings,[11] with no substantial progress being made toward a comprehensive settlement. During the June 21 meeting the Company's June 2 package and its pension-insurance proposal were discussed again, with no resolution. On June 28, at the fifteenth meeting, the Company introduced its second "package" proposal as an alternative to the June 2 offer. This package contained an immediate wage increase approximating 8 to 10 cents per hour, about one cent per hour more than the increase embodied in the June 2 package. This offer, however, contained no proposals respecting either vacations or pensions. The Union rejected this offer, commenting that "it looks like we are moving backwards rather than forward." [12]

8. Hereinafter, all dates are references to 1966 unless otherwise noted.

9. "Non-economic" demands usually encompass those proposals which are not readily reducible to monetary cost estimates. Here, 30 of the 54 Union proposals were so categorized. [J.A. 216–225].

10. There is diverse testimony concerning the severability of any of the proposals contained in this package. The Company did say at one point that "the vacation and pension plans are tied together." [J.A. 138] However, there is also testimony that the Union was free to accept the entire package or bargain otherwise as it saw fit [J.A. 78, 92–93, 138, 232–233], and that "The pension and insur-

ance agreement, however, are not tied to the vacation plan improvements although both of them, as well as the other company proposals, are all in the same package." [J.A. 141–142]

11. There were some sixteen bargaining sessions from May 18 through June 29. The June 2 package was presented and rejected at the sixth meeting.
It is worth noting that there was no mention of the unfair labor practice charge by either the Company or Union in the ensuing negotiations.

12. In its brief, the Union explained that this offer "was 5½ cents per hour *less* than the value of the June 2 offer" because the vacation improvements includ-

At the sixteenth meeting, on June 29, the Company offered a third "package" to the Union. In substance, it was identical to the June 2 offer except that the wage increase was approximately three cents per hour greater than that included in the first package. The package was explained as:

[A] complete and final package, to settle all issues raised during the course of the negotiations. It is not to be juggled, would not pull out anything or put in something else. [sic]

Unless this committee agrees by Friday, July 1, 1966, at 4:00 p. m. to this offer and will recommend it to their membership at a ratification meeting scheduled no later than Tuesday, July 5, 1966, we will start to shut down the plant at 4:00 p. m., Friday, July 1, 1966, and will complete the shutdown by 12:01 a. m., Saturday, July 2, 1966.

We expect your full cooperation with us in the protection of our equipment and facilities.

We are just as much aware of the IUD program by what we have heard and what we have read as you are. We do not intend to be in the position of trying to operate this plant under conditions as we understand them to be. As I have said, we are aware of the IUD program and it does not make sense to continue operations on this basis without a work agreement.

J.A. 156.[13]

At this point, although there is some conflict in the testimony, the trial examiner found that the Union asked whether the Company was closing the door to future bargaining, and the Company responded that it was not. Thereupon the Union negotiators protested: "You have injected into these negotiations subject matter not subject to bargaining this year. Is the vacation plan available without the pension plan?" The Company's answer was that, "You have our final package offer." On July 1, the Union rejected the Company's June 29 proposal in writing. Upon receipt of this rejection, the Company shut down the Alloy plant on July 1.[14]

---

ed in the June 2 offer were valued at approximately 6½ cents per hour. Brief for Petitioner at 11 (emphasis in original). However, in evaluating this contention, it should be noted that the Company considered "the new vacation plan [to be] a very desirable thing from the employees' standpoint and a quite costly thing from the employer's standpoint, and the company was not willing to just give it away." [J.A. 16] Obviously the Company felt that future bargaining on the pension-insurance issue, with anticipated collective Union participation, might have resulted in contracts with a higher economic cost to the Company than the 6½ cent benefit involved in the proposed vacation plan. Therefore, "[d]epending on the outcome of those future negotiations [the June 28 proposal] might well have been a *more expensive package for the company.*" [J.A. 54].

13. The reference to "the IUD program" evidently results from among other things, statements by S. J. Harris, Assistant Director, Collective Bargaining Section of the IUD, made at an April 1966 meeting between Company industrial relations representatives and representatives from the

various local unions of the Carbide Nationwide Council. In remarks addressed to the Company representatives Harris stated: "You are in trouble this year. By August or September you will have a number of plants down." [J.A. 111, 248].

14. On July 26, 1966, the General Counsel of the NLRB issued a complaint against Union Carbide alleging that it had violated Section 8(a) (1), (3), (5) & (d) of the Act by insisting upon its pension-insurance proposals and by locking out its employees in an effort to compel acceptance of the proposals. Thereupon, the General Counsel applied for a temporary injunction pursuant to Section 10(j) of the Act, 29 U.S.C. § 160(j) (1964), in the United States District Court for the Southern District of West Virginia. The Court denied the injunction, finding that the evidence before the Court did not justify the inference that the Company closed down the Alloy plant "for the purpose of modifying or terminating the pension agreement" and that "the closing of the plant facility at Alloy was for the sole purpose of bringing economic pressure to bear in support of [the

■ The Board, in accord with the trial examiner, found that the pension-insurance agreement having an expiration date of July 2, 1967 was not a mandatory subject of bargaining during the 1966 negotiations. From this the Board concluded that the Union was not required to bargain about the subject, and the Company could not lawfully insist upon any modifications thereof. The Board specifically disagreed, however, with the examiner's conclusion that the Company had insisted to the point of impasse on the Union's acceptance of the nonmandatory proposal and had locked out its employees to accomplish that result. Instead, the Board found that the Company's conduct during the negotiations evidenced a desire to arrive at a settlement on the terms for a new basic agreement, that the pension-insurance proposals were offered to facilitate settlement, and that the lockout, "after impasse was reached on issues other than the pension-insurance matter," was permissible economic pressure in support of a legitimate bargaining position under American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Accordingly, the complaint was dismissed in its entirety.

Based upon our review of the entire record, we conclude that there is substantial evidence to support the Board's conclusion that the bargaining impasse was not the result of unlawful insistence by the Company on the nonmandatory subject of pension-insurance coverage; hence the Board's determination must be

affirmed. *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Western States Regional Council No. 3, Int'l Woodworkers v. NLRB, 130 U.S.App.D.C. 176, 398 F.2d 770 (1968); American Fed'n of Television and Radio Artists v. NLRB, 129 U.S.App.D.C. 399, 395 F.2d 622 (1968); Oil, Chemical & Atomic Workers, Local 4-243 v. NLRB, 124 U.S. App. D.C. 113, 362 F.2d 943 (1966); Dallas Gen. Drivers, Warehousemen and Helpers, Local 745 v. NLRB, 122 U.S.App. D.C. 417, 355 F.2d 842 (1966).

■ In making this determination we do not overlook the divergent inferences and conclusions drawn by the Board and trial examiner. Here, the Board and the examiner agreed on the basic facts and the applicable rule of law to be applied to those facts. Their disagreement was based on the inferences to be drawn from those facts. The Board is the body entrusted by Congress with the responsibility of decision-making aimed at effectuating the policies of the Act,[15] "and it is not precluded from reaching a result contrary to that of the Examiner when there is substantial evidence in support of each result." Oil, Chemical & Atomic Workers, Local 4-243, *supra* at 115-116, 362 F.2d at 945-946.

■ In support of its conclusions, the Board correctly relies upon NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), wherein the Court explained that Section 8(d)'s definition[16] of man-

---

Company's] legitimate bargaining position under the law." [J.A. 170-171] By stipulation of the parties, the transcript of testimony before the District Court was introduced as evidence before the Trial Examiner and constituted part of the record before the Board and this Court.

15. The Administrative Procedure Act's provisions respecting the role of the Agency and its trial examiners is worth reiterating:

On appeal from or review of the initial decision [here the trial examiner's decision], the agency has all the pow-

ers which it would have in making the initial decision except as it may limit the issues on notice or by rule.

5 U.S.C. § 557 (1964).

16. Section 8(d) provides:
(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of

datory subjects of collective bargaining, made operative by the Company's duty to bargain with its employees' designated representatives within Sections 8(a) (5) and 9(a),[17] does not preclude the introduction of nonmandatory subjects into the bargaining process. What is forbidden is such insistence on a nonmandatory proposal that a failure to bargain on the mandatory subjects results. *Id.* at 349, 78 S.Ct. 718. *Borg-Warner* and its progeny [18] are concerned not with nonmandatory proposals which are included to enhance the attractiveness of offers made on mandatory subjects. Nor do they forbid what we have here, packages and proposals which economically augment the mandatory proposals in an effort to secure acceptance of nonmandatory ones. This is the very fabric of effective collective bargaining. This court has previously recognized that a party "ha[s] a right to present, even repeatedly, a demand concerning a non-mandatory subject of bargaining, so long as it [does] not posit the matter as an ultimatum." International Longshoremen's Association v. NLRB, *supra* at 331, 277

F.2d at 683. What the Act prohibits is a party's insistence to the point of impasse upon a nonmandatory proposal, Philip Carey Mfg. Co. v. NLRB, *supra* at 727, so that acceptance of the proposal becomes "a condition precedent to accepting any collective-bargaining contract." *Borg-Warner, supra,* 356 U.S. at 344, 78 S.Ct. at 720. To proscribe lesser conduct would be to prohibit that bargaining technique which, though evidencing firmness of position, does not constitute bad faith.

█ The Board's disagreement with the examiner's conclusions was based upon its determination that the total bargaining process during the May and June negotiations, as supplemented by its evaluation of the bargaining history of the parties and surrounding circumstances, evidenced the Company's desire to reach an agreement. In pursuing this goal, the Company's less than subtle emphasis on the nonmandatory pension-insurance issue did not constitute unlawful insistence, for the Board specifically found that "the Union had not expressly

---

a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession. * * *

29 U.S.C. § 158(d) (1964).

17. Sections 8(a) (5) and 9(a) provide:
8(a) It shall be unfair labor practice for an employer * * *
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
* * * * *
9(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. * * *
29 U.S.C. §§ 158(a) (5), 159(a) (1964).

18. *See,* NLRB v. International Hod Carriers, 384 F.2d 55 (9th Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 853, 19 L.

Ed.2d 980 (1968); NLRB v. Muskegon Bricklayers Union No. 5, 378 F.2d 859 (6th Cir. 1967); Houchens Market of Elizabethtown, Inc. v. NLRB, 375 F.2d 208 (6th Cir. 1967); NLRB v. American Compress Warehouse, Division of Frost-Whited Co., 350 F.2d 365 (5th Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472 (1966); Philip Carey Mfg. Co. v. NLRB, 331 F. 2d 720 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964); Industrial Union of Marine and Shipbuilding Workers v. NLRB, 320 F.2d 615 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964); NLRB v. Davison, 318 F.2d 550 (4th Cir. 1963); Local 164, Brotherhood of Painters v. NLRB, 110 U.S.App.D.C. 294, 293 F.2d 133, cert. denied, 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961); NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2d Cir. 1961); NLRB v. Goldblatt Bros., Inc., 286 F.2d 665 (7th Cir. 1961); International Longshoremen's Ass'n v. NLRB, 107 U.S.App.D.C. 329, 277 F.2d 681 (1960); NLRB v. International Bhd. of Elec. Workers, 266 F.2d 349 (5th Cir. 1959).

and unequivocally rejected the nonmandatory bargaining demand. * * " In fact, it was not until the Company presented its June 29 package that "the Union negotiators for the first time declared their opposition to [the Company's] injection of the nonmandatory issue into the basic contract negotiations." Finally, the Board concluded that the nonmandatory proposal contained in the June 29 package "was not a factor in causing the impasse." Our review of the record reveals no basis for disturbing the Board's determination on this question which is particularly "suited to the expert experience of a board which deals constantly with such problems." Dallas Gen. Drivers, Local 745 v. NLRB, *supra* at 419–420, 355 F.2d at 844–845.

Because Petitioner's assertion of an illegal lockout by the Company rests upon the erroneous premise that the lockout was employed to coerce the Union into accepting an unlawfully demanded nonmandatory bargaining proposal, the Board properly dismissed this contention. *See* American Ship Bldg. Co. v. NLRB, *supra*.

The Board's decision and order is therefore

Affirmed.

Circuit Judge TAMM did not participate in the consideration or decision of this case.