415 F.2d 440
 72 L.R.R.M. (BNA) 2132
 HESS OIL & CHEMICAL CORPORATION, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Hess Oil &
ChemicalCorporation, Intervenor.
 Nos. 21928, 26681.
 United States Court of Appeals Fifth Circuit.
 Sept. 2, 1969.
 
 W. D. Deakins, Jr., Charles L. Berry, Houston, Tex., for petitioner Hess Oil & Chemical Corp.; Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel.
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William Wachter, Arthur A. Horowitz, Attys., N.L.R.B., Washington, D.C., for the N.L.R.B.
 Chris Dixie, James P. Wolf, Houston, Tex., Jerry D. Anker, Cole & Groner, Washington, D.C., John Tadlock, James J. Cronin, Denver, Colo., for Oil, Chemical and Atomic Workers Intern. Union.
 Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District judge.
 COLEMAN, Circuit Judge:
 
 
 1
 These cases spring from a common source and will be decided by this consolidated opinion. The order of the National Labor Relations Board, 167 NLRB, No. 8 (1967)[1] will be enforced. The petition for review in No. 26,681 will be denied.
 
 I Prior Proceedings
 
 2
 Proceedings prior to this review may be summarized as follows:
 
 
 3
 1. Unfair labor practice charge filed against Hess Oil and Chemical Corporation April 2, 1963, alleging that the company violated the National Labor Relations Act by refusing to bargain with the union, in violation of 8(a) (5) and (1), and by engaging in an illegal lockout of its employees at its Corpus Christi refinery;
 
 
 4
 2. Complaint filed May 15, 1963;
 
 
 5
 3. The trial examiner finds the company to be in violation of the Act on both counts of the charge and complaint, November 18, 1963;
 
 
 6
 4. Decision of the National Labor Relations Board, adopts the trial examiner's findings, September 16, 1964;
 
 
 7
 5. October 19, 1964, the Board and Hess Oil move this Court to stay further proceedings pending the United States Supreme Court decision in American Ship Building v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855. Stay granted, October 30, 1964;
 
 
 8
 6. The Board moves the Fifth Circuit for a second stay to allow the Board to consider the impact of American Ship Building. Motion granted, June 2, 1965;
 
 
 9
 7. The Board issues its Supplemental Decision and Order (August 17, 1967) reaffirming its previous finding on the failure to bargain question but setting aside that part of the earlier decision which held the company to have engaged in an illegal lockout;
 
 
 10
 8. Hess Oil petitions this Court for a review of the Board order and the Board cross petitions for enforcement. That case was docketed and calendared here as No. 21,928;
 
 
 11
 9. June 10, 1968, the Oil, Chemical and Atomic Workers International Union filed a petition in the United States Court of Appeals for the District of Columbia Circuit to review that portion of the Board's order concerning the lockout. Hess intervened and moved that the union's petition be transferred to the Fifth Circuit. Motion granted August 19, 1968. The case is docketed and calendared here as No. 26,681.
 
 II Facts
 
 12
 On January 27, 1963, Hess Oil and Chemical Corporation purchased the properties of Delhi-Taylor Oil Refining Company, including a refinery at Corpus Christi, Texas. At that time, and for many years prior thereto, the production and maintenance employees at Delhi-Taylor's Corpus Christi plant were represented, for collective bargaining purposes, by the Oil, Chemical and Atomic Workers International Union.
 
 
 13
 To prepare for negotiations with the union, H. W. McCollum, a vice-president of Hess, met March 8, 1963, with two officers of the union, W. I. Forrester and J. Elro Brown. At that time, McCollum announced that Hess had purchased the Delhi-Taylor refinery and wished to negotiate a new contract with the union. He expressly rejected assumption of the existing collective bargaining agreement between the union and Delhi-Taylor and insisted on an entirely new contract. That Hess had no obligation to assume the previously existing Delhi-Taylor contract is not disputed.
 
 
 14
 One of the major changes McCollum insisted upon was that the laboratory and warehouse employees at the refinery be excluded from the bargaining unit, as it had previously existed, although it was conceded that these employees appropriately belonged to this unit. McCollum contended that their exclusion was necessary because of certain changes Hess wished to make in the employment structure at Corpus Christi. For example, the laboratory employees, who were not covered by collective bargaining agreements at Hess's other plants, would periodically be transferred from location to location. Therefore, to place them in a bargaining unit would restrict the company's freedom to deploy them to other plants. As to the warehouse employees, McCollum stated that Hess intended to retain only one such employee, who would be engaged primarily in record keeping activities.
 
 
 15
 Another Hess proposal was that the employees at Delhi-Taylor be placed on probation from April 1 to June 1, and that their employment could be terminated during that period without the right to file grievance procedures. Hess, did, however, agree to adopt many of the provisions in the existing contract with Delhi-Taylor, such as vacation and sick leave benefits. Finally, McCollum told the union representatives that the union would have to accept Hess's suggested contract terms in order for the refinery to remain in operation past April 1, the date it was to take possession from Delhi-Taylor.
 
 
 16
 Thereafter, the parties met eight times prior to April 1. McCollum presented Hess's proposals in writing and offered modifications in the company's position, but steadfastly declined to change the proposed requirement that the warehouse and laboratory employees be excluded from the bargaining unit. The union rejected all company proposals and insisted, instead, that its contract with Delhi-Taylor be adopted without change for one year.
 
 
 17
 McCollum submitted a complete contract proposal March 25 which incorporated many of the existing contract provisions. This proposal was, the same day, rejected. Upon learning that the proposal had been rejected, McCollum called the union to determine what it really wanted. He was informed that Delhi-Taylor had refused to turn over certain information requested by the union and was withholding vacation and termination pay from the employees. Brown told McCollum that if he could 'get those thieves off his back' (alluding to Delhi-Taylor) an agreement with Hess could probably be reached.
 
 
 18
 McCollum, eager not to shut the refinery down, met with Delhi-Taylor's president in New York March 26 and volunteered to pay half of the vacation and termination pay (over $100,000) if Delhi-Taylor would agree to pay the remainder and furnish the information requested by the union. This was eventually accomplished. The union and Hess met twice after McCollum's meeting with Delhi-Taylor's president, and the information from Delhi-Taylor was supplied.
 
 
 19
 However, no contractual agreement was reached, so the Corpus Christi refinery ceased operations April 1. It remained closed until May 7. Hess then recalled most of the employees who had previously worked there.
 
 
 20
 Following the shut down of the refinery, the union filed charges with the Board, alleging that Hess violated 8(a)(5) and (1) by refusing to bargain with it and by locking out its employees. The trial examiner found that the company had violated 8(a)(5) and (1) by insisting on the exclusion of the laboratory and warehouse employees from the bargaining unit and by closing the plant.
 
 
 21
 The Board agreed with the trial examiner that the company's insistence on the employee exclusion constituted a refusal to recognize the union as the bargaining agent of those employees and ordered it to bargain with the union as the exclusive representative of all employees in that unit, including the laboratory and warehouse employees, 148 NLRB 1080. The Board found, however, that the 'record contains overwhelming evidence that Respondent (Hess) was desirous of entering into a contract with the Union and it engaged in good-faith bargaining to that end'. Furthermore, the Board findings rejected the contention that the company's position on this issue 'served to frustrate collective bargaining on other issues or that the company conditioned execution of an agreement with the Union upon the Union's agreement to exclude the laboratory and warehouse employees.'
 
 
 22
 In this initial order the Board agreed with the trial examiner that the closing of the plant constituted an illegal lockout.
 
 
 23
 Faced with these results, Hess filed a petition to review the Board order. Subsequently, both the Board and Hess filed a motion to stay the proceedings until the Supreme Court should decide American Ship Building Company v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). After that decision was rendered, the Board again moved for a stay to consider its impact on the instant case. That stay was granted.
 
 
 24
 The Board filed a supplemental decision and order August 17, 1967, 167 NLRB No. 8. It reaffirmed its earlier finding that the company's insistence on the exclusion of the warehouse and laboratory employees from the bargaining unit violated 8(a)(5) and (1). It set aside, however, that portion of the original decision in which it had found that the lockout was illegal.
 
 
 25
 As previously stated, the company now petitions for review of the Board finding that the company committed an unfair labor practice by insisting upon the exclusion of the warehouse and laboratory employees from the bargaining unit. The union petitions for review of the Board finding that the lockout was not unlawful.
 
 
 26
 NO. 21,928-- HESS OIL AND CHEMICAL CORPORATION v. NATIONAL LABOR RELATIONS BOARD
 
 
 27
 Hess contends that it is not guilty of violating 8(a)(5) and (1) as to the proposed exclusion of the laboratory and warehouse workers because that issue was a mandatory subject of bargaining and the proposal did not bring about the bargaining impasse between the company and the union. It is said that this is true although Hess concedes that a unit of production and maintenance employees at the Corpus Christi refinery, including warehousemen and laboratory employees, was an appropriate unit. We must reject this argument.
 
 
 28
 It runs as follows: If this issue was a mandatory subject of bargaining, Hess had a right to insist upon it to impasse. See N.L.R.B. v. American Compress Warehouse, Division of Frost-Whited Company, 5 Cir., 1965,350 F.2d 365; cert. denied, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472. On the other hand, if it were merely a voluntary subject of bargaining, it still had a right to bargain on the subject but could not insist upon it to impasse. See N.L.R.B. v. Floridan Hotel of Tampa, Inc., 5 Cir., 1963, 318 F.2d 545. That is to say, one party could not condition acceptance of the collective bargaining agreement upon the other party's acceptance of a non-mandatory subject of bargaining, N.L.R.B. v. Wooster Division of Borg-Warner Corporation, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Applying those well established rules to the instant case, the company argues, the following result is accomplished: If the exclusion of certain employees is a mandatory bargaining subject, the company could insist upon it to impasse, and by so doing there would be no failure to bargain. If, however, this is only a voluntary subject of bargaining, the Board specifically found that the company's acceptance of the contract with the union was not dependent on the union's acceptance of the exclusion of the warehouse and laboratory employees from the bargaining unit and that the company did not insist upon this subject to the point of impasse. Consequently, the company, under the Borg-Warner doctrine, still did not violate the Act. See, also, Oil, Chemical and Atomic Workers International Union, Local 3-89 v. N.L.R.B., D.C. Cir., 1968, 405 F.2d 1111, 1116.
 
 
 29
 The fatal flaw in this argument is that in the context now before us the issue was neither a mandatory nor a voluntary subject for bargaining.
 
 Section 9(a) of the Act provides:
 
 30
 'Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.'
 
 
 31
 Pursuant to that section, it has been often held that an attempt (to impasse) to restrict bargaining to only certain members of an appropriate unit or to expand bargaining to include those beyond an appropriate unit is an unfair labor practice. In one instance, for example, the employer wanted to recognize the union as the bargaining agent only for union members. In rejecting the employer's attempt the court held that
 
 
 32
 'the recognition required by 9(a) is not a bargaining matter as petitioner sought to make it. When it was disclosed to petitioner that Local 226 represented a majority of the employees in the appropriate unit, (this was at no time questioned by petitioner) the obligation was then fixed upon it to recognize the Local as the sole and exclusive bargaining agent, not only for the members of the Union, but for all employees. In place of complying with this statutory requirement, petitioner made it the subject of a long and extended bargaining process. Subsequent to the time when demand for recognition was made, petitioner, at all times, has been in default of its statutory obligation. Neither can the consequences of its refusal to grant complete recognition be dissipated by the fact-- if it be a fact-- that it bargained with the Union on all other matters in dispute. In our view of the situation, there could be no genuine bargaining as contemplated by the Statute until complete recognition had been granted as the Act requires. Notwithstanding the fact that it agreed not to bargain with any other group or individual, its bargaining with Local 226, while limiting its recognition solely to members of the Union, made such bargaining abortive and of little, if any, effect.'
 
 
 33
 McQuay-Norris Manufacturing Company v. N.L.R.B., 7 Cir., 1940, 116 F.2d 748, 751. See, also, United Biscuit Company v. N.L.R.B., 7 Cir., 1942, 128 F.2d 771.
 
 
 34
 In Douds v. International Longshoremen's Association, 2 Cir., 1957, 241 F.2d 278, the court pointed out that there was a clear distinction between 'private bargaining over conditions of employment and administrative determination of the unit appropriate for bargaining':
 
 
 35
 'The parties cannot bargain meaningfully about wages or hours or conditions of employment unless they know the unit of bargaining. That question is for the Board to decide on a petition under Section 9(c) of the Act, and its decision is conclusive on the parties, although the decision may subsequently be changed.'
 
 
 36
 241 F.2d at 282. The court further declared that the only process of changing the appropriate bargaining unit
 
 
 37
 'not permitted by the Act is one that denies the Board this ultimate control of the bargaining unit and disrupts the bargaining unit itself. This is precisely what occurs when, after the Board has decided what the appropriate bargaining unit is, one party over the objection of the other demands a change in that unit. Such a demand interferes with the required bargaining 'with respect to rates of pay, wages, hours, and conditions of employment' in a manner excluded by the Act. It is thus a refusal to bargain in good faith * * *.'
 
 
 38
 Id., 241 F.2d at 283.
 
 
 39
 Finally, in N.L.R.B. v. Southland Cork Company, 4 Cir., 1965, 342 F.2d 702, the Board had certified the union as the bargaining agent for all production and maintenance employees at the company's plant, but the company insisted that the recognition clause in the contract be restricted to permanent employees. The court held that the company's attempt to change the unit was a violation of 8(a)(5) 'since the Act required it to accord recognition to the union as representative of all the employees in the unit', 342 F.2d at 706. See, also, United Aircraft Corporation (Hamilton Standard Division) v. N.L.R.B., 2 Cir., 1964, 333 F.2d 819; International Brotherhood of Electrical Workers, 116 N.L.R.B. 1792 (1958); enforced N.L.R.B. v. International Brotherhood of Electrical Workers, 5 Cir., 1959, 266 F.2d 349.
 
 
 40
 We hold that an issue concerning the construction of an appropriate unit so as to exclude certain members from that unit is not a subject for bargaining and an insistence upon it constitutes a violation of 8(a)(5). The fact that the unit involved here was a contractual unit rather than one certified by the Board should not lead to a different result, since the duty to bargain depends on neither a Board election nor certification, N.L.R.B. v. Movie Star, Inc., 5 Cir., 1966, 361 F.2d 346.
 
 
 41
 NO. 26,681-- OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION v. NATIONAL LABOR RELATIONS BOARD.
 
 
 42
 The trial examiner found that, after hard but good faith bargaining, negotiations between Hess and the union reached an impasse March 28, 1963, and that Hess's lockout imposed April 1 was designed to bring economic pressure on the union to compel it to sign an agreement on Hess's terms. In accordance with the law existing at the time, he determined that the lockout violated the Act. However, the Board, in reviewing the case, after the Supreme Court decision in American Ship Building Company v. N.L.R.B., supra, reached the opposite conclusion. The union now contends that because the Board here found that Hess violated 8(a)(5) by insisting on the exclusion of the warehouse and laboratory employees from the bargaining unit, American Ship Building is not dispositive and the lockout was illegal.
 
 
 43
 In American Ship Building, the sole issue before the Court was whether an employer violates the Act, after a bargaining impasse has been reached, by temporarily shutting down his plant 'for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position', 380 U.S. at 318, 85 S.Ct. at 967. It was held that a lockout for that purpose did not violate the Act.
 
 
 44
 As to the argument that an offensive lockout was a violation of 8(a)(1), the Court found that such use was in no way 'inconsistent with the right to bargain collectively or the right to strike,' 380 U.S. at 310, 85 S.Ct. at 963. And as to the allegation that a lockout for such purpose violated 8(a)(3), the Court first noted that an 8(a)(3) violation turned on employee motivation. The Court then proceeded to examine the employer's motive:
 
 
 45
 'As this case well shows, use of the lockout does not carry with it any necessary implication that the employer acted to discourage union membership or otherwise discriminate against union membership as such. The purpose and effect of the lockout were only to bring pressure upon the union to modify its demands. Similarly, it does not appear that the natural tendency of the lockout is severely to discourage union membership while serving no significant employer interest. * * * It is true that the employees suffered economic disadvantage because of their union's insistence on demands unacceptable to the employer, but this is also true of many steps which an employer may take during a bargaining conflict, and the existence of an arguable possibility that someone may feel himself discouraged in his union membership or discriminated against by reason of that membership cannot suffice to label them violations of 8(a)(3) absent some unlawful intention. * * *' 380 U.S. at 312-313, 85 S.Ct. at 964.
 
 
 46
 In light of American Ship Building, it has been held that in the absence of any evidence that the employer was hostile to the union, or had attempted to interfere with the union's rights to collective bargaining, or had used the lockout 'in the service of designs inimical to the process of collective bargaining', or that the layoff was intended to discipline employees for supporting the union, a lockout is not an unfair labor practice, Detroit Newspaper Publishers Association v. N.L.R.B., 6 Cir., 1965, 346 F.2d 527, 531.
 
 
 47
 In a case heavily relied upon by the Board in the instant case, the company sought agreement on a 'pension insurance' matter, which was not a subject of mandatory bargaining. A lockout followed. The Board, however, found that the company had not insisted to the point of impasse on the union's acceptance of the non-mandatory subject and then locked out its employees to accomplish that result. Rather, the Board found
 
 
 48
 'that the Company's conduct during the negotiations evidenced a desire to arrive at a settlement on the terms for a new basic agreement, that the pension-insurance proposals were offered to facilitate settlement, and that the lockout, 'after impasse was reached on issues other than the pension-insurance matter,' was permissible economic pressure in support of a legitimate bargaining position under American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).'
 
 
 49
 Oil, Chemical and Atomic Workers International Union, Local 3-89 v. N.L.R.B., D.C.Cir., 1968, 405 F.2d 1111, 1116. On review, the Court found substantial evidence to support the Board's conclusion that the impasse was not a result of the company's insistence on the non-mandatory bargaining subject and affirmed the Board's decision, 405 F.2d at 1116.
 
 
 50
 It has been held, however, that a lockout is illegal where the evidence strongly supports the conclusion that the purpose of the lockout is to prevent the employees from freely determining their bargaining representative and to keep the employees' present representative subservient to the employer, Tonkin Corporation of California v. N.L.R.B., 9 Cir., 1968, 392 F.2d 141. In addition, the Board has held a lockout to be illegal where the impasse which had been reached resulted from the employer's refusal to negotiate in a lawful manner and not from a good faith disagreement over economic matters, American Stores Packing Company, Acme Markets, Inc., 158 N.L.R.B. 620 (1966).
 
 
 51
 The Board in this case made the following findings: (1) the insistence on the exclusion of the warehouse and laboratory workers from the bargaining unit did not frustrate collective bargaining on other issues and did not contribute to an impasse on the other issues; (2) there was no evidence that Hess conditioned the signing of a contract upon the union's acceptance of Hess's proposal for the bargaining unit exclusion; (3) the union's rejection of Hess's contract proposals was due neither 'solely' nor 'primarily' to Hess's insistence on the exclusion of the warehouse and laboratory employees; (4) that Hess would have locked out its employees even had the bargaining unit issue been withdrawn from negotiations; and (5) that the lockout was not prompted by anti-union animus. These findings are unquestionably supported by substantial evidence.
 
 
 52
 In No. 21,928 the order(s) of the Board will be enforced.
 
 
 53
 In No. 26,681 the petition for review is denied.
 
 
 
 [1]
 Supplementing 148 NLRB 1080 (1963)