**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN TRANSPORT, INC., Respondent.**

**No. 18031.**

United States Court of Appeals
Eighth Circuit.

Feb. 1, 1966.

---

George H. Cohen, Attorney, N. L. R. B., and Arnold Ordman, General Counsel, N. L. R. B., Dominick L. Manoli, Associate General Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., and Elliott Moore, Attorney for N. L. R. B., on the brief, for petitioner.

Karl H. Mueller, Fort Worth, Tex., and Harold E. Mueller, Fort Worth, Tex., on the brief, for respondent.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

This is a proceeding pursuant to Section 10(e) of the National Labor Relations Act (29 U.S.C. § 151 et seq.) on petition of the National Labor Relations Board for enforcement of its order issued against Southern Transport, Inc. The Board's decision and order are dated December 16, 1964, and are reported at 150 N.L.R.B. No. 20. This is the second proceeding filed in this Court against Respondent.

Respondent is a relatively small concern (about 20 employees of which 15 are truck drivers, mechanics and helpers comprising the bargaining unit under Section 9 (b) of the Act) engaged in transportation and distribution of petroleum products received through an interstate pipeline. Its principal place of business as well as the place of the alleged unfair labor practice is in El Dorado, Arkansas.

Following a successful representation election in September 1962, the Union (Truck Drivers and Helpers Local Union No. 568, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America) was certified as the bargaining agent of Respondent's employees. The Union met with Respondent on four occasions over the next six months. Thereafter, the Union filed a complaint with the Board, charging that Respondent had failed in its duty to bargain in good faith as required by the Act. Respondent contended that it had bargained in good faith but that a genuine impasse had been reached. The matter was heard before a Trial Examiner in which conflicting testimony was introduced. The Examiner's report upheld the position of the union declaring that Respondent had refused to bargain in good faith. The matter was then brought before the Board, which in an order dated December 24, 1963, upheld most of the findings of the Trial Examiner. This order was eventually enforced by decree of this Court based on a decision dated April 14, 1965 and reported at 343 F.2d 558.

By letter of January 3, 1964, following the decision of the Board and prior to this Court's consideration of the first Petition for Enforcement, Respondent requested the Union to allow a certified court reporter to make a transcript of the negotiations at future meetings, and later conditioned further negotiations on the Union's acceptance of this request. Respondent, by a subsequent clarifying statement to the Board, indicated that it was willing to bear the entire expense of the record, but to be of any value it had to be mutually binding. Respondent's demand was refused and on March 20, 1964, the Union filed charges in the instant case, again alleging refusal to bargain in good faith. The usual proceedings before a Trial Examiner were waived and the matter was transferred directly to the Board for a decision. The Board determined in the Order now before the Court that:

"Under all these circumstances, we conclude that the Respondent, in insisting that a reporter be present at future negotiating meetings, was not acting in good faith. Rather, when the Respondent's conduct herein is viewed as it must be against the background of its conduct as reveal-

ed in the earlier case, it is manifest, and we find, that its insistence on having a reporter at negotiating meetings, despite the Union's objections thereto, had as its purpose the continued avoidance of negotiating meetings with the Union. * * * Respondent, by insisting on a stenographic record of negotiations as a precondition for any future meetings, violated Section 8(a) (5) and (1) of the Act."

█ The issue is, therefore, can Respondent under the circumstances of this case condition further negotiations on the presence of a court reporter paid by it to make a binding verbatim record of the negotiations? We believe the Respondent could properly so condition the negotiations, and the Order of the Board to the contrary should not be enforced.

█ The Board concedes, as it must, that the request for a record is not *per se* improper or illegal. There is no legislative sanction against such a procedure nor is the procedure *malum in se*. On the contrary a verbatim record may be of inestimable value in resolving conflicts and conserving time in clarifying the issues. The Court agrees that such a request may not always be proper, and when made in bad faith, it violates a party's bargaining obligation. On the other hand, since the demand for a transcript is, in itself, legal, it is incumbent on the party asserting its impropriety to bear the burden of proof on this issue. The Board decided that Respondent's demand was made in bad faith, but it is our belief that there is no substantial evidence in the record upon which this finding could be based and the Order founded on such a decision must be denied enforcement. 29 U.S.C.A. § 160(e).

█ The record discloses no direct or positive evidence that respondent's demand was not made for a proper motive. An example of such direct evidence might possibly be threats to demand a reporter if certain ultimatums were not accepted. Likewise, we agree with the language found in N.L.R.B. v. Reed & Prince Mfg.

Co., 205 F.2d 131, 139 (1 Cir. 1953), cert. den. 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953) that the demand itself is not evidence of bad faith:

"[W]e are not inclined to agree with the Board that the Company's insistence, over the Union's strenuous objection, on having a stenotypist present at all the bargaining meetings to take down a verbatim transcript of the proceedings was evidence of the Company's bad faith."

██ There being no direct evidence on Respondent's motive, the Board "viewed the background of [Respondent's] conduct as revealed in the earlier case" and seemingly concluded that since they had already determined that Respondent was acting in bad faith in the past, its present demand for a record must have been made in equally bad faith. This reasoning is not only objectionable as presuming illegal conduct on the part of Respondent, it is fallacious in assuming a party once adjudicated in bad faith remains so and cannot genuinely desire a record. For as we shall see, it is the party which has already been adjudicated to be acting in bad faith that will most likely demand that a record be kept of future negotiations. Furthermore, the proposition that a prior adjudication of bad faith will alone support a finding that a demand, otherwise lawful, was made in the present instance in bad faith is unacceptable to our standards of justice. Not only is this past adjudication lacking of proper probative value, but if the Board were to be upheld on this point, one adjudication of bad faith would place the burden on a party to thereafter prove the good faith of all his future activities. His every demand would be tainted by the past adjudication. This would place the party in a substantially unequal footing with his bargaining counterpart in all future negotiations, likely resulting in one-sided settlements in labor disputes. In addition, if one adjudication were sufficient evidence to support any future findings of bad faith, the Board would thereafter be armed with all the evidence

necessary to sustain its position in future holdings against this party. The courts would be virtually removed from the scene and the party, deprived of judicial protection, would thereafter be at the mercy of an overzealous Board. We, therefore, cannot hold that the adjudication of bad faith on an earlier occasion is alone substantial evidence of present bad faith to support the Board's finding. We recognize that the Board may view and consider the background of the parties and their past conduct as it relates to their management-employee practices, but findings and conclusions based on that evidence alone are not sufficient for a valid order.

 Not only does it appear that the conclusions of the Board are lacking evidentiary support, but we believe the facts of this case support the reasonableness of Respondent's request.

In reaching this decision, we recognize there is some difference of opinion on this issue, but we are not convinced that any sound reason exists for a party objecting to a transcription of negotiations when that party does not have to bear any of the expense in connection therewith.

Neither the Board nor the Courts have squarely ruled on the issue of whether a party could lawfully require, as a precondition to negotiations, that a reporter be present to make a transcript of the proceedings which transcript would be binding on the parties. The Court recognizes the basis of this unfair labor practice charge is concerned with the motive with which Respondent is attempting to conduct its negotiations. However, the primary issue is the legitimacy of the Respondent's request and insistence, over the objection of the Union, on the presence of a qualified court reporter. The General Counsel contends that this demand shows that Respondent was not in good faith attempting to reach an agreement. The Board in its Decision and Order found merit in that contention, and, also, thought it was significant that the Respondent did not make the presence of a reporter a condition to the resumption of negotiations until after the issuance of the Board's decision. Thus, the Board's decision was based in part on issues other than that of a qualified reporter being present to make a verbatim transcription. But, the third member of the Board, Gerald A. Brown, concurred in the decision on the specific ground:

"I find that the insistence upon a stenographic transcript of negotiations is, by its very nature, a rejection of the bargaining duty and undermines the collective-bargaining relationship."

and then without setting forth his reasons gave as a basis therefor his separate concurrence in St. Louis Typographical Union No. 8 (Graphic Arts Association of St. Louis, Inc.), 149 N.L.R.B. No. 71. That decision was by the full Board of five members, all concurring in the result. The majority affirmed the Trial Examiner's decision that the Union's refusal to meet with a court reporter present to make a verbatim transcript of the bargaining did not constitute an unfair labor practice on the part of the Union. There the bargaining negotiations were formerly conducted in the presence of a reporter but after 1953 the practice was discontinued at the Union's request because of its belief that a commitment to keep the transcript confidential had been violated. In the following decade collective bargaining was conducted without a stenographer being present. The Trial Examiner found both parties had taken their positions either for or against a transcript in good faith. The majority then found the Board's decision in *Reed & Prince Mfg. Co.* distinguishable since there was no element of bad faith found on the part of either party as there was in *Reed & Prince*. The Board in St. Louis Typographical Union No. 8 discusses their decision in *Reed & Prince* as follows:

"[T]he Board noted that the insistence on the presence of a stenographer was not usually the approach taken in good faith by a participant in order to reach agreement but 'was more consistent with the building of

a defense to anticipated refusal to bargaining charges:' "

The Board then reasoned that the effect to the presence of a stenographer must be read in the context of other evidence of bad faith which was present in that case and that in subsequent decisions, the legality of insisting upon a stenographic transcript at bargaining sessions would be determined in the light of the entire bargaining context rather than on a *per se* basis, using the following significant language:

"In the instant case, as noted by the Trial Examiner, it is clear that respected authorities differ in their opinion of the effect of making a stenographic transcript in collective-bargaining sessions. It is not our intention here either to endorse or condemn the practice of utilizing a stenographer during bargaining negotiations. Rather, in this matter we shall undertake to determine only whether, in assuming its position, the Respondent acted in a manner consistent with the principles of good-faith bargaining required by the Act."

Mr. Brown in his separate concurring opinion in *Reed & Prince*, along with Member Fanning, reasoned that preliminary matters, such as place of meeting and use of transcript, should not be elevated to the status of mandatory collective bargaining; that to do so, would be to permit negotiations to flounder before they begin and would place another tool of avoidance in the hands of those who would use all available means to thwart the collective-bargaining process. Further, that since the employer would not even consider the Union's reason for opposing the presence of a stenographer, insistence upon this arrangement effectively precluded any collective bargaining and thereby left no solution available other than complete capitulation. His concurring opinion reads:

"The existence of mutual trust and confidence between the parties is basic to an effective and harmonious collective-bargaining relationship. Yet, as in the instant case, the very suggestion that a verbatim record be made may raise suspicions as to the ultimate use for which it is to be put and, thereby, inject into the relationship an added basis for mistrust and contention. Imposing a stenographer upon the negotiator who in good faith believes that the presence of the reporter will only inhibit his ability to bargain effectively can only serve to undermine and seriously impair the collective-bargaining process. Recent studies indicate that both management and unions recognize these inhibiting factors and predominantly tend to avoid the use of a stenographer.

"The very nature of the proposal to make a stenographic transcript of all bargaining sessions is such that the matter should be weighed carefully before it is advanced and, if any opposition there to is expressed, it should be withdrawn. An adamant insistence upon such a demand in the context of present day bargaining is itself, in our opinion, a rejection of the bargaining duty. We would, therefore, hold that requiring a transcript, whether at the option of one of the parties, as proposed by the Employer here, or by means of collective bargaining, as suggested by the majority decision, constitutes an undermining of the collective bargaining relationship."

The decisions and comments of the Board are set forth at length in an attempt to ascertain any sound reason for the proposition that the use of a transcript in negotiation proceedings is illegal and constitutes either evidence or conclusive evidence (depending on the views of the different Board members) of bad faith. The Court recognizes as a practical matter that the supplying of a transcript is an additional cost burden on collective bargaining and should not be resorted to, unless deemed advisable by either party, who then, if they are not in agreement with the use of the same, the

one requesting must bear the expense thereof. Increased cost in litigation and in administrative proceedings is certainly to be avoided, but, on the other hand, those who feel that their interest is in jeopardy because of the lack of a verbatim record should be permitted, if they are willing to bear the cost thereof, to secure a written record.

The First Circuit in *Reed & Prince Mfg. Co.*, supra, found nothing objectionable in insisting on a transcript of the bargaining proceeding. In the present case, the Union gave no reason for its adamant objection to the use of a certified or qualified reporter, which makes it somewhat difficult to attempt to view objectively the reasons why an arrangement for a verbatim transcript (other than cost) would be inimical to the collective-bargaining process. The only objection of which we are aware is the fear that the presence of a reporter might have an inhibiting effect on negotiations. There is some apprehension that the parties will be reluctant to put forth "feelers" on propositions on which they do not wish to be bound in the future. While recognizing the free interchange of ideas and propositions is a necessary part of the negotiating process, we do not believe that a record would be detrimental to this interchange. For the parties are free to discuss points outside of the bargaining room and even while in bargaining sessions they are free to make "off the record" statements. Fragmentations of the negotiating session may be obtained as desired by the parties, leaving the full session for recorded discussion.

The process of administration of justice is performed in the courts with the presence of a reporter. The keeping of this record is invaluable in protecting all of the parties and providing an intelligent basis for appellate review. Even in trial discussions, of which a record is not desired, the parties may, and do, participate in informal negotiations or off the record colloquies. Thus the two interests of party protection and informal negotiation are jointly served in the judiciary with the presence of a reporter. We be-

lieve the same is possible in the area of labor relations. When protection of a party or appellate review requires a record, we believe the same may be granted without necessarily harming the normal bargaining procedures. The reasons advanced by the Board are certainly not persuasive. It says mutual trust is necessary in the collective-bargaining process. Certainly, but where there has been a dispute in what transpired at prior negotiation meetings, the use of a transcript might well serve as the basis for instilling mutual trust and respect rather than causing a wider divergence between the parties. Thus we can perceive of no sound reason except the cost (which is not at issue herein) and desire to reduce the expense of the bargaining process that would call for a legal sanction against the use of a verbatim transcript or record.

■■■ The Board calls attention to the fact that the Federal Mediation and Conciliation Service and the National Mediation Board have a practice of not utilizing the services of a stenographer unless both parties request such procedure, and also refers to an article "Preparing for Collective Bargaining" which contains the information that only 24 of 239 employers surveyed utilize some form of verbatim transcript. Both of these facts are understandable and certainly any added expense burden should not be undertaken or made mandatory on the parties unless the parties are in agreement or unless either party in order to protect its interest feels that it needs such a record and is willing to pay for it.

If experience demonstrates that the party desiring a transcript is abusing the process of collective bargaining, the matter can be reviewed in the light of experience, and if the insistence on the making of a verbatim transcript is an inherent evil when used in the collective-bargaining process, as contended by a minority of the Board, Congress certainly has the authority to effectively deal with that problem. At this time, however, we will attempt to set forth the rea-

son why the value of a verbatim record appears to us to outweigh any of the reasons advanced so far against it.

While unable to discover any positive arguments against the keeping of a record, and the Union advancing nothing more positive in the defense of its adamant objection than it thought a record unnecessary, we have been directed to a number of positive reasons why a record would be desirable in this case.

If a party is bargaining in good faith, as he must do under the law, we do not believe that he would normally object to being held accountable for what he said or failed to say. A party acting in bad faith, on the other hand, would be very unhappy at the prospect of the Board or the Court being furnished a complete record of his activities. A record, therefore, would be a positive force for good faith negotiations. The bargaining table is certainly no place for frivolity or dishonesty, which a person is allowed to disclaim simply because no accurate record is kept. All parties present at negotiating sessions are responsible individuals who in turn must be responsible for their acts. If a party does not want to be held to his word, he should exercise careful discretion during negotiations. This discretion and good faith, however, are demanded at all times, by both parties, and are not to be turned "on" and "off" merely by the factor of whether or not a record is being kept.

Our whole system of jurisprudence is based upon the written decision of case-by-case determination of legal principles and concepts as applied to varied factual situations. The factual determination is often more difficult and more important than the ascertainment of the legal principles applicable. Any arrangement or method by which a more accurate determination of fact can be made by the trier of the fact would appear highly desirable. The credibility of the witnesses and the weight and value accorded to their testimony are also for the trier of fact and are not upset on appellate review unless clearly erroneous or without substantial evidence on the whole record. Therefore, as a general proposition it is only through a record that the Board, the courts, and the parties themselves can accurately be apprised of what transpired in the negotiating room. Individual testimony from whatever source is at best inexact, and inexact to a considerable degree when it comes exclusively from partisan sources. Thus a record would not only be useful to the parties in their future negotiations, but it would be invaluable to the Board or the Court if either were called to make an accurate and fair determination of the rights and liabilities of the negotiating parties. The obtaining of more accurate justice, which a record would undoubtedly secure, is a goal to be sought not only by the courts and the public at large, but should be a goal that is equally unobjectionable to the litigating parties.

The specific facts of this case further support Respondent's request. The parties had been engaged in past negotiations. These negotiations broke down. Respondent contended that an impasse had been reached, and presented supporting testimony. The Union offered contradictory evidence and contended that Respondent simply refused to bargain. The Board did not accept Respondent's version of the negotiations and issued a cease and desist order against it. At this point Respondent, without a record, is faced with a dilemma. It may accede to some of the Union demands, even though it feels they are at an impasse, or it may stand its ground and risk another complaint from the Union. Absent a record, such a complaint would result in another "swearing match" with the testimony of the Union representative pitted against that of the Company. The result of such a contest would hardly be in doubt. The Board so recently accepting the position of the Union could hardly be expected to find for Respondent. A record would eliminate much of the difficulty of this dilemma. If Respondent believes its factual account is accurate, that an impasse has been reached, it could clearly record its position, as well as the position of the

Union, and have this record, unadorned by any dispute as to what was said, placed before the Board. It is perhaps only through such a record that Respondent at this point would be able to vindicate its position. Once being disbelieved, it is only with a record that Respondent feels it can again safely approach the Board. Only a record proving what transpired could prevent another "swearing match."

It is easy for us to observe that the past litigation between the parties has not been over their substantive legal obligations, but the dispute has been almost exclusively limited to merely "what was said." Recognizing this is by nature an adversary business, we cannot expect accurate reflections of "what was said" to come from the mouths of the participants whose memories, as all memories, are subject to the erosion of time and the discoloration of economic and personal self interest. The fact-finding body may be given two poles, one of which it must accept, neither of which may reflect the truth. "What is said" can accurately be preserved only by recording it, as it is said, by a person or machine detached from the ultimate outcome.

Therefore, when "what was said" is of vital importance in order to accurately determine the substantive rights and duties of the parties, and the history of the negotiations has been a history of dispute and litigation to what transpired during the negotiating sessions, a party willing to bear the cost of a record is perfectly justified in demanding an end to the needless and inconclusive dispute.

Furthermore, when by prior adjudication a respondent's factual analysis has been rejected as not being an accurate reflection of the truth, and it feels its analysis is justified, it should be free to seek in good faith a record which will disclose whether or not it was correct in its evaluation. Future rights, which include the possibility of a contempt citation, need not be left to the chance of faulty, mistaken, or inaccurate testimony. In its precarious position Respondent is entitled to seek the complete protection a record might afford.

■ It is clear that Respondent is willing to bear the entire expense of the record and is not using the demand to place an economic vise on the negotiations. Use of a record for economic strangulation of opposition can never be proper.

■ It is therefore our opinion that when there has been past dispute and litigation over the positions of the parties at the negotiating meetings, absent a showing of improper purpose, the party willing to bear the expense may condition future negotiations on the presence of a certified reporter who will keep an accurate record, binding on both parties, which will be made available to both parties.

It is to be understood that our decision in this case shall have no effect on our prior decision involving these same parties. Southern Transport, Inc., is still under order to bargain in good faith with the representatives of the Union. Both parties under the law must bargain in good faith, meet, discuss their differences, and make bona fide attempts to resolve the issues. It is in their mutual interest that a satisfactory solution be reached. The Respondent is under an additional legal sanction, by virtue of the Court's prior decision ordering enforcement of the Board's Decision and Order of December 24, 1963 (Entered April 14, 1965), to bargain in good faith or else subject itself to the possibility of a contempt citation. The decision in this case merely holds that Respondent under the facts herein enumerated may validly condition future negotiations upon the presence of a qualified reporter at its expense and the decision and order of the Board now before the Court to the contrary shall not be enforced.

Petition for enforcement denied.