630 F.2d 171
 105 L.R.R.M. (BNA) 2393, 89 Lab.Cas. P 12,231
 LATROBE STEEL COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, AFL-CIO, Intervenor.
UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Latrobe Steel Company, Intervenor.
 Nos. 79-2299, 79-2709.
 United States Court of Appeals,
Third Circuit.
 Argued June 12, 1980.
Decided Aug. 19, 1980.
 
 Peter D. Post, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., argued, for petitioner in No. 79-2299 and intervenor in No. 79-2709.
 Daniel P. McIntyre, United Steelworkers of America, Pittsburgh, Pa., argued, for petitioner in No. 79-2709 and intervenor in No. 79-2299.
 Vivian Miller, National Labor Relations Board, Washington, D. C., for respondent.
 Before HUNTER, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 This case centers around the attempted negotiation of a collective bargaining contract between the Latrobe Steel Company (the Company) and the United Steelworkers of America (the Union). We are called upon to review the decision of the National Labor Relations Board, which found the Company guilty of three unfair labor practices for refusing to bargain with the Union in violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1976) (the Act), and acquitted the company of another charge. The Board also found that a strike which occurred subsequent to the alleged unfair labor practice was an unfair labor practice strike and ordered reinstatement of the strikers with back pay. The Board presents a cross petition for enforcement of its decision.
 
 
 2
 The parties met 27 times between June 7 and August 1, 1977, but were unable to conclude an agreement to replace the existing 1974 contract. At the expiration of that contract, on August 1, 1977, the Union went out on strike. Negotiations continued intermittently from mid August until November, when they resumed on a full time basis. The Union filed an unfair labor practice charge on December 20, 1977, which alleged several violations of the Act. Specifically, the union alleged that the Company had violated the duty to bargain imposed by § 8(a)(5) of the Act by improperly insisting on the presence of professional stenographers at bargaining sessions and by insisting "to impasse" on the inclusion in the collective bargaining agreement of three clauses concerning non-mandatory subjects of bargaining.
 
 
 3
 The case was heard by an administrative law judge (ALJ) who found unfair labor practices based on the stenographer issue and two of the three contractual issues. The ALJ further found that because of these unfair labor practices the strike was an "unfair labor practice strike." The Board affirmed the rulings, findings, and conclusions of the ALJ. We will enforce the Board's decision only insofar as it finds that the Company's insistence on the issue of the presence of a stenographer constitutes an unfair labor practice. We will not enforce the decisions relative to the unfair labor practices based on the two proposed contract clauses, or to the characterization of the strike. Finally, we will affirm the dismissal of the charge based on the third contractual clause.
 
 
 4
 * A. The Stenographer Issue
 
 
 5
 At the first negotiating session, the Company's chief negotiator introduced two professional court reporters and indicated that these reporters would, on the Company's behalf, record all of the negotiations. He further noted that nothing would be "off the record" and that the transcripts of the negotiations would be made available in the Company's personnel office to all interested persons, including the employees. The Union objected to this procedure. Following a lengthy discussion, the company negotiator stated "(a) ll right, we have been talking about this subject for almost an hour. We can talk about it for another hour, but I have to inform you that the transcripts will be at the personnel office. That is as blunt as I can put it." Despite continued objections by the Union throughout the course of the negotiations, and the filing of an unfair labor practice charge on June 21, 1977,[1] the stenographers were present at every negotiating session.[2] Based on this and other evidence, the ALJ concluded that it was clear that the Company would only negotiate on the record, with stenographers present, and that no discussion of negotiable issues would be permitted to take place off the record.
 
 
 6
 In addition, the ALJ found that the issue was a non-mandatory subject of bargaining. He therefore found the Company guilty of an unfair labor practice for refusing to bargain with the Union.
 
 B. The Contract Proposals
 
 7
 In prior contracts, the Company, which produces specialty steel products, and the Union had adopted the Basic Steel Settlement Agreement, negotiated between the Union and the companies comprising the basic steel industry. In the instant negotiations, the Union again demanded the adoption of the Basic Steel Settlement Agreement, as well as the continuation of the provisions of the 1974 agreement between the Company and the Union. The Company, however, sought to negotiate a separate agreement. In addition, the Company proposed 22 specific changes in the existing agreement. The Union, in addition to its position on the Basic Steel Agreement, made 21 specific proposals.
 
 
 8
 Three of the Company's proposals are relevant to this case. First, the Company proposed that the local union be made a signatory to the collective bargaining agreement. Traditionally, the Union had been the only signatory to the agreement, although officers of the local had signed in their capacity as members of the Union bargaining committee. Since 1937, the Union, or its predecessors, had been the recognized bargaining representative of the employees.
 
 
 9
 Second, the Company demanded that the grievance procedure be altered to require individual employees to sign all grievances. This would, in effect, have precluded the Union from bringing general grievances on behalf of unidentified employees.
 
 
 10
 Finally, the company proposed a change which would have given employees the option to attempt to settle grievances at the second level of the grievance procedure, either with or without the presence of a union representative. A similar option had previously existed at the first level by agreement of the parties.
 
 
 11
 The ALJ found the first two proposals to concern non-mandatory subjects of bargaining and that an impasse existed prior to the time the Union went on strike. He further found that the Company's insistence on the first two proposed clauses contributed to, and helped to cause the impasse. He stated that it was impossible to find, as the Company contended, that the impasse would have occurred in the absence of the non-mandatory proposals. Finally, the ALJ found that the third disputed proposal did not constitute a non-mandatory subject of bargaining. Accordingly, this charge was dismissed.
 
 II
 
 12
 Section 8(a)(5) of the Act states that "(i)t shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees . . . ." 29 U.S.C. § 158(a)(5) (1976). Section 8(d) defines collective bargaining, in relevant part, as the
 
 
 13
 performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment . . . but such obligation does not compel either party to agree to a proposal or require the making of a concession.
 
 
 14
 Id. § 158(d).
 
 
 15
 In NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the Supreme Court held that the duty to bargain in good faith is limited to the subjects of wages, hours and terms and conditions of employment. On matters concerning those subjects "neither party is legally obligated to yield." Id. at 349, 78 S.Ct. at 722. On the other, the so-called non-mandatory matters, "each party is free to bargain or not to bargain, and to agree or not to agree." Id. However, a party is not permitted to insist on a non-mandatory subject as a condition or a prerequisite to an agreement on the mandatory subjects. Id.; NLRB v. Operating Engineers Local 542, 532 F.2d 902, 907 (3d Cir. 1976), cert. denied, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977). Such insistence constitutes, in effect, "a refusal to bargain about the subjects that are within the scope of mandatory bargaining." Borg-Warner, 356 U.S. at 349, 78 S.Ct. at 723.
 
 
 16
 In the instant case, the Company was found to have committed unfair labor practices by refusing to bargain in that it unlawfully insisted on three allegedly non-mandatory subjects. A charge based on insistence on a fourth non-mandatory subject was dropped by the ALJ. As to each of these alleged non-mandatory subjects we must first review the board's determination of whether or not the issue involved was in fact non-mandatory. We must then consider whether there was unlawful insistence by the company on that subject. The Supreme Court has made it clear that the Board has special expertise in classifying bargaining subjects as mandatory or non-mandatory and that Congress specifically delegated to the Board the primary responsibility of defining the scope of the duty to bargain. See Ford Motor Co. v. NLRB, 441 U.S. 488, 495-96, 99 S.Ct. 1842, 1847-48, 60 L.Ed.2d 420 (1979); Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 685-86, 85 S.Ct. 1596, 1599-1600, 14 L.Ed.2d 640 (1965). Accordingly, where the Board's order has reasonable basis in law and is not inconsistent with the structure of the Act, our review is quite circumscribed. Ford Motor Co., 441 U.S. at 497, 99 S.Ct. at 1849.
 
 A. Stenographers
 
 17
 In Bartlett-Collins Co., 237 N.L.R.B. 770 (1978), the Board overruled a long line of cases which had, in effect, treated issues preliminary to the negotiation of an agreement, including the issue of the presence of a court reporter at negotiations, as mandatory subjects of bargaining.[3] Id. at 772-73. The Board's prior position had been that "preliminary matters are just as much part of the process of collective bargaining as the negotiations over wages, hours, etc.," General Electric Co., 173 N.L.R.B. 253, 257 (1968), and that it was
 
 
 18
 wholly consistent with the purposes of the Act that the parties be allowed to arrive at a resolution of their differences on preliminary matters by the same methods of compromise and accommodation as are used in resolving equally difficult differences relating to substantive terms and conditions of employment.
 
 
 19
 St. Louis Typographical Union, No. 8, 149 N.L.R.B. 750, 752 (1964). Accordingly, the Board had applied a good faith standard in evaluating the propriety of a party's insistence on the presence of stenographers. See, e.g., Architectural Fiberglass Co., 165 N.L.R.B. 238, 239 (1967); St. Louis Typographical Union, No. 8, 149 N.L.R.B. 750, 751-52 (1964); Allis Chalmers Mfg. Co., 106 N.L.R.B. 939 (1953). In Bartlett-Collins, however, the Board reexamined the question of the presence of court reporters at negotiating sessions and concluded that the issue did not involve "wages, hours, and other terms and conditions of employment". 237 N.L.R.B. at 772. The Board reasoned that
 
 
 20
 The question of whether a court reporter should be present during negotiations is a threshhold matter, preliminary and subordinate to substantive negotiations such as are encompassed within the phrase "wages, hours, and other terms and conditions of employment." As it is our statutory responsibility to foster and encourage meaningful collective bargaining, we believe that we would be avoiding that responsibility were we to permit a party to stifle negotiations in their inception over such a threshhold issue.
 
 
 21
 Id. at 773.
 
 
 22
 The Board's newly expressed position is a reasonable interpretation of the Act. We perceive no significant relationship between the presence or absence of a stenographer at negotiating sessions, and the terms or conditions of employment of the employees. Cf. Chemical Workers Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971) (mandatory subjects limited to issues that settle an aspect of the relationship between the employer and employees); NLRB v. Massachusetts Nurses Ass'n, 557 F.2d 894, 897-98 (1st Cir. 1977) (an interest arbitration clause is a non-mandatory subject of bargaining as it bears only a remote or incidental relationship to terms or conditions of employment); Leeds & Northrup Co. v. NLRB, 391 F.2d 874, 877 (3d Cir. 1968) (principle at heart of statutory provision is requiring negotiation on basic terms which are vital to the employees' economic interest). It would be contrary to the policy of the Act, which mandates negotiation over the substantive provisions of the employer-employee relationship, to permit negotiations to break down over this preliminary procedural issue.
 
 
 23
 The Company contends that the Board's new position is contrary to law. To support this contention the Company argues that the Board's long standing interpretation of the Act, which had applied a good faith standard, is entitled to great weight. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). In addition, the Company cites three court of appeals cases which have applied the good faith standard to preliminary issues of bargaining procedures. NLRB v. Southern Transport, Inc., 355 F.2d 978 (8th Cir. 1966) (stenographers); Mid-America Transportation Co. v. NLRB, 325 F.2d 87 (7th Cir. 1963) (site of bargaining); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir. 1953) (insistence on stenographers is not evidence of bad faith).
 
 
 24
 The Company's reliance on these cases, however, is misplaced. In Bell Aerospace, the Board attempted to change its prior long-standing position concerning the Act's coverage of managerial employees. The Court used the Board's long-standing interpretation of the Act in conjunction with its finding of a clearly expressed legislative intent that managerial employees were outside of the scope of the Act. 416 U.S. at 274-89, 94 S.Ct. at 1761-69. In particular, the Court noted on Congress' reenactment of the legislation without relevant change in the face of the Board's early cases as evidence of congressional agreement with the Board's position. Id. at 275, 94 S.Ct. at 1762. This is different from the instant case where the only clearly expressed intent of Congress was that the definition of mandatory subjects of bargaining was peculiarly within the Board's area of expertise. See Ford Motor Co. v. NLRB, 441 U.S. 488, 495-96, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). In such cases, it is clear that so long as the Board's new position is fully reasoned and explained, and that the position does not exceed the bounds of its Act, the Board is not precluded from overruling its prior cases.[4] NLRB v. J. Weingarten, Inc., 420 U.S. 251, 264-67, 95 S.Ct. 959, 967-968, 43 L.Ed.2d 171 (1975). See Local 777, Seafarers International Union, 603 F.2d 862, 893-94 (D.C. Cir.1978); NLRB v. Wentworth Institute, 515 F.2d 550, 555 (1st Cir. 1975). Moreover, the fact that three courts of appeals had utilized a good faith standard in earlier cases is not dispositive in light of the existing Board position at the time those cases were decided.[5]
 
 
 25
 The Company also argues that the Board's new position expands the concept of non-mandatory subjects beyond that which was intended by Borg-Warner. This argument would have us limit the applicability of the mandatory, non-mandatory dichotomy to those issues which a party seeks to incorporate into a collective bargaining agreement. It is based on the statement in Borg-Warner that the employer may not "refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining." NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Borg-Warner is not so limited. The opinion notes that there is a core of issues about which the parties are compelled by the Act to bargain, but about which they need not agree. The Court's reasoning makes clear that the parties are not to be permitted to avoid bargaining on these core issues by insisting on subjects outside of this core. As long as the issue is not defined to be within this core of wages, hours, and other terms and conditions of employment, it matters not whether the issue concerns a clause to be inserted in the current contract. Moreover, even were we to find that Borg-Warner was limited in the manner suggested by the Company, it would not necessarily follow that the Board overstepped its authority in applying a rule based on the Borg-Warner rationale to these, preliminary, procedural issues. Accordingly, we will affirm the Board's conclusion that the presence or absence of stenographers constitutes a non-mandatory subject of bargaining.
 
 
 26
 We are, however, concerned with the Board's affirmance of a decision of an ALJ which seems to imply that in all instances, the party that wishes to introduce a stenographer into the negotiations is committing the unfair labor practice. See generally NLRB v. Southern Transport, Inc., 355 F.2d 978 (8th Cir. 1966); St. Louis Typographical Union, No. 8, 149 N.L.R.B. 750, 758 (1964) (discussing the benefits of stenographers at negotiations).[6] In Bartlett-Collins, the Board explicitly stated that the issue of the presence of a stenographer was a matter "over which neither party is lawfully entitled to insist to impasse." 237 N.L.R.B. at 772-73. It would appear that it is equally violative of the Act to insist on the absence of stenographers as to insist that stenographers be present. The fact that an issue is a non-mandatory subject of bargaining does not of itself require that one substantive result be favored over another. It implies only that the parties may not preclude other negotiations on the basis of that issue.[7] Borg-Warner, 356 U.S. at 349, 78 S.Ct. at 722. In the instant case, however, the union was not charged with an unfair labor practice as they stood ready to bargain, and in fact did negotiate, in the presence of the stenographer. Accordingly, the substantive question of the appropriateness of stenographers was not before the Board in this case.
 
 
 27
 Having concluded that the stenographer issue is a non-mandatory subject of bargaining, we must decide if the company unlawfully insisted upon the presence of stenographers. The ALJ found that the Company violated §§ 8(a)(5) and (1) of the Act "by insisting to impasse upon professional reporters to make verbatim transcripts." In making this finding, the ALJ followed the language of Barlett-Collins and numerous other cases which have made it unlawful to insist upon non-mandatory subjects "to impasse." 237 N.L.R.B. at 773. See, e. g., National Fresh Fruit & Vegetable Co. v. NLRB, 565 F.2d 1331, 1334 (5th Cir. 1978); Philip Carey Mfg. Co. v. NLRB, 331 F.2d 720, 727-28 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964). The Company contends that there was no "impasse" in this case because the parties continued to bargain in the presence of the stenographer and that when an impasse finally occurred, it had nothing to do with the stenographers, but was rather due to the inability of the parties to come to an agreement over mandatory subjects.
 
 
 28
 Much of the confusion over this issue is attributable to the talismanic invocation of the word "impasse" to describe that level of insistence which triggers the Borg-Warner unfair labor practice. The concept of "impasse" is relevant in several contexts involving collective bargaining. In each context, however, its significance is somewhat different. "Impasse" may be used to describe that point at which there is a sufficient disagreement over a mandatory subject of bargaining to permit unilateral action by one of the parties on that subject. See, e. g., NLRB v. Katz, 369 U.S. 736, 741-42, 82 S.Ct. 1107, 1110-11, 8 L.Ed.2d 230 (1964); Dallas General Drivers Local 745 v. NLRB, 355 F.2d 842, 844-45 (D.C.Cir.1966); Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615, 621 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). It may also be used to refer to a breakdown in all negotiations over either one or several issues. See, e. g., Oil, Chemical & Atomic Workers Local 3-89 v. NLRB, 405 F.2d 1111, 1117 (D.C.Cir.1968); accord, Philip Carey Mfg. Co. v. NLRB, 331 F.2d 720, 726-28 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964); Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). In this latter sense, "impasse" is relevant to the Borg-Warner question. See page ----, infra; Marine & Shipbuilding Workers, 320 F.2d 615 at 618; accord, Oil, Chemical & Atomic Workers Local 3-89, 405 F.2d at 1117; Philip Carey, 331 F.2d at 726-28. We have grave doubts, however, as to the usefulness of the concept of "impasse" as a level of disagreement over a single issue where that issue is a non-mandatory subject of bargaining. As Borg-Warner makes clear, there can be no adverse consequence from a party's failure to agree or even his failure to bargain about a non-mandatory subject of bargaining. What Borg-Warner prohibits is insistence upon a non-mandatory subject as a condition precedent to entering an agreement. 356 U.S. at 349, 78 S.Ct. at 722. This is the standard which must guide the inquiry. See NLRB v. Operating Engineers Local 542, 532 F.2d 902, 907 (3d Cir. 1976), cert. denied, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977); accord, NLRB v. Sheet Metal Workers Local 38, 575 F.2d 394, 398 (2d Cir. 1978); Hess Oil Corp. v. NLRB, 415 F.2d 440 (5th Cir. 1969).
 
 
 29
 When viewed in this light, we believe that there is substantial evidence on the record as a whole, see Universal Camera Co. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), to support the Board's finding that the Company insisted on the presence of stenographers as a precondition to bargaining and, a fortiori, as a precondition to any agreement on mandatory issues. After almost one hour of discussion, and despite vigorous union objection, the Company negotiator simply stated that the transcript would be available to be read and that that was "as blunt as (he) could put it." To require the union to have refused to bargain in the face of this insistence would be contrary to the purpose of Borg-Warner. Accordingly, the Board's finding of an unfair labor practice on the stenographer issue will be affirmed.
 
 B. The Contract Provisions
 
 30
 We now turn to the Company's contract proposals. Because we conclude that the Company did not unlawfully insist on these proposals, we shall not enforce the unfair labor practice findings relating to them. This decision makes it unnecessary to address the Company's contention that the clauses in question actually concerned mandatory subjects of bargaining. This issue is irrelevant to our disposition of the case.
 
 
 31
 The ALJ found it to be undisputed that the negotiations had reached an impasse by the time that the union went on strike. He relied on the existence of that impasse to support his finding of unlawful insistence by the company on the allegedly non-mandatory contract proposals.[8]
 
 
 32
 Once again, analysis must begin with Borg-Warner's holding that a party may not avoid bargaining on the mandatory subjects by insistence on non-mandatory proposals. Borg-Warner, 356 U.S. at 349, 78 S.Ct. at 722; see Oil, Chemical & Atomic Workers Local 3-89, 405 F.2d 1117. This is precisely what occurs when a party's insistence on non-mandatory proposals causes negotiations between the parties to reach an impasse. Moreover, it is well-settled that the insistence upon the non-mandatory proposal need not be the sole cause of the parties' failure to reach agreement in order for a Borg-Warner violation to be found. Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615, 618 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964); accord, Rogers Mfg. Co. v. NLRB, 486 F.2d 644, 649 (6th Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974); Philip Carey, 33 F.2d at 728.
 
 
 33
 The Company argues that it may not be held responsible for the impasse, which it argues was caused by the Union's insistence on acceptance of the basic steel settlement agreement rather than by its insistence on the non-mandatory proposals. It contends that an impasse on the mandatory subject of bargaining would have occurred even in the absence of its position on the non-mandatory proposals. The ALJ did not accept this contention, concluding that "it is impossible to know as a matter of hindsight what the union might have done . . . if the (company) had not exacerbated the negotiations with unilaterally imposed conditions." We cannot agree with this conclusion.
 
 
 34
 The record demonstrates that even had the Company dropped its non-mandatory proposals, the parties would have been at an impasse. From June 7 until August 1, the Union did not move from its original positions. Most notably, a witness for the general counsel testified the Union insisted that there would be a strike unless the Company agreed to accept the Basic Steel Settlement Agreement. Indeed, the evidence indicates that the Union's position was that it would not even call a meeting of the membership unless the Company accepted the Basic Steel Settlement Agreement and dropped its 22 demands. The Company's negotiator testified that shortly before the strike, members of the Union committee had stated "they had a mandate from the rank and file that they must have the 1977 Steel Settlement Agreement in its entirety, and there are to be no changes in the 1974 basic agreement, and that there would be no meetings as far as ratification meetings or any other type of meetings unless they satisfied that mandate." This position was maintained by the Union far beyond the date at which the ALJ found the bargaining impasse. We do not believe that there is substantial evidence on the record to support the Board's conclusion that the Company had not met its burden in demonstrating that an impasse would have occurred even in the absence of the non-mandatory proposals.
 
 
 35
 While it is true that insistence on non-mandatory proposal, need not be the sole cause of the impasse in negotiations, it must be a cause of the impasse. In the instant case, the impasse would have occurred even absent the party's insistence on the non-mandatory proposals. Under the facts of this case, it cannot be said that the insistence on the non-mandatory proposal prevented agreement on any mandatory subjects.[9] Therefore, the prohibition of Borg-Warner has not been violated. The mere fact of an impasse coincidental to continued disagreement on a non-mandatory subject of bargaining will not trigger the Borg-Warner unfair labor practice.
 
 
 36
 Accordingly, we will deny enforcement of the finding of unfair labor practices based on the Company's two contract proposals. It also becomes unnecessary to consider the Union's claim that the Company's proposal concerning the second level of the grievance procedure constituted a non-mandatory subject of bargaining. On this, the Board's finding of no unfair labor practice will be affirmed.
 
 III
 
 37
 Finally, we consider the Board's conclusion that the strike which began on August 1, 1977, was an unfair labor practice strike, and its corresponding order that the strikers are entitled to reinstatement and back pay. See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); NLRB v. Cast Optics Corp., 458 F.2d 398 (3d Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). For a strike to be deemed an unfair labor practice strike, it must, at least in part, be caused by an unfair labor practice. See Cast Optics Corp., 458 F.2d at 398; Electrical Workers Local 613 v. NLRB, 328 F.2d 723, 726 (3d Cir. 1964); accord, Cagle's, Inc. v. NLRB, 588 F.2d 943, 950 (5th Cir. 1979); Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814, 820 (6th Cir. 1975). The mere fact that an unfair labor practice is committed prior to a strike does not necessarily render that strike an unfair labor practice strike. See NLRB v. Broadmoor Lumber Co., 578 F.2d 238, 242 (9th Cir. 1978); NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 704-05 (7th Cir. 1976); Cf. Cagle's, 588 F.2d at 950 (5th Cir. 1979) (must be evidence of causal connection).
 
 
 38
 In the instant case, the Board found that the three unfair labor practices, which it had concluded had been committed by the employer, were causes of the strike. We are presented with a somewhat different question, since we have concluded that only the Company's insistence on the presence of stenographers constituted an unfair labor practice. We do not believe that the record, considered as a whole, could support a finding that the strike was in part caused by this unfair labor practice.[10]
 
 
 39
 The record is devoid of evidence that the presence of stenographers contributed to the Union decision to strike. On the contrary, the vice-president of the local, Mr. Ehman, who was a member of the negotiating committee, testified that the Union's position on July 29, 1977, three days before the strike, was that there would be a strike "unless the Union's number one proposal (acceptance of the Basic Steel Settlement Agreement) was agreed to between the parties, and that the Company's 22 demands . . . were withdrawn." The Company's chief negotiator testified that this position had been expressed by several other members of the Union's negotiating committee as well. Moreover, the Company's chief negotiator testified that on July 29, Mr. Ehman stated, "we will be striking over economics." There is no mention on the record of any link between the strike and the stenographers. Accordingly, we cannot affirm the Board's finding that the strike was an unfair labor practice strike and we will not enforce the order of reinstatement and back pay.
 
 
 40
 To summarize, we will enforce the order of the NLRB only insofar as it concerns the unfair labor practice based on the Company's unlawful insistence upon the presence of stenographers. The order based on the other unfair labor practice findings will not be enforced, nor will the strike be characterized as an unfair labor practice strike. Finally, we will affirm the Board's dismissal of the remaining unfair labor practice charge.
 
 
 41
 WEIS, Circuit Judge, concurring and dissenting.
 
 
 42
 I agree with the majority that substantial evidence supports the Board's finding that the company committed an unfair labor practice by insisting upon the presence of a stenographer at the bargaining sessions.
 
 
 43
 My difference with the majority is with its appraisal of the company's demands that the local be made a party to the contract and that all grievances be signed by individual employees. In my view, both of these proposals were nonmandatory subjects of bargaining, and the company's adamant position on them contributed substantially to the failure to reach an agreement on mandatory subjects in violation of § 8(a)(5).
 
 
 44
 For 30 years preceding the bargaining session under discussion here, the company had entered into collective bargaining agreements with the International union and had recognized it as the exclusive bargaining agent for the employees. The International's constitution provided that it was to be "the contracting party in all collective bargaining agreements." Before the strike began, the union took the firm position that it would not accept an agreement violative of that basic policy and warned the company that insistence on that proposal would result in no contract. Considering this evidence, the Board found that the employees had assented to the union's practice over the years and determined that the company was not justified in "insisting to the point of impasse" on the International relinquishing its status as the sole bargaining representative.
 
 
 45
 I am convinced that this proposal advanced a nonmandatory topic of bargaining. In NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the Court held that a recognition clause seeking a substitution of a local for the International union as the signatory to the agreement did not come within the definition of mandatory bargaining. The employer had insisted on such a clause, and both the Board and the courts found this maneuver to be an unfair labor practice. Concededly, the case at hand differs insofar as the employer seeks to add the local, rather than substitute for it. But even if that be an arguably less intrusive encroachment on employees' § 9 rights, it nonetheless violates the spirit of Borg-Warner. As one commentator notes, Borg-Warner and similar decisions reflect a "specific public policy that issues relating principally to the representational status of the parties should be determined without disrupting negotiations either decided voluntarily by the parties or through the machinery of the Board, but not by coercion at the hands of the stronger party." R. Gorman, Basic Text on Labor Law 525 (1976). The Board's finding that this contract proposal was on a nonmandatory subject of bargaining, therefore, is correct.
 
 
 46
 The company's second proposal that all grievances be signed by individual employees also concerns a nonmandatory subject. In fact, it is virtually identical to the one we found to be nonmandatory in Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615 (3d Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). That decision is binding on this panel, and, accordingly, the Board should be sustained on its position that the employer engaged in an unfair labor practice by refusing to remove this item from its non-negotiable demands.
 
 
 47
 The majority does not reach these issues, asserting that there is no evidence demonstrating a causal connection between the employer's insistence on these contract proposals and the strike. In my view, however, the majority has unduly limited the thrust of precedent in this court.
 
 
 48
 The controlling case, once again, is Industrial Union of Marine & Shipbuilding Workers v. NLRB, supra. There, the employer disputed a Board finding of impasse on nonmandatory subjects by arguing that the proposals under scrutiny played a relatively minor part in the dispute. Buttressing this assertion, the employer pointed to a specific Board finding that an impasse was reached on all disputed matters, not merely the nonmandatory ones. Nevertheless, this court concluded that enough of a nexus between the nonmandatory contract proposals and the impasse had been shown:
 
 
 49
 "It was not necessary for the Board to find that the company's insistence on this proposal was the sole cause of the failure to reach agreement. If the proposal is not a mandatory bargaining subject, insistence upon it was a per se violation of the duty to bargain. . . . Any other rule would permit insistence upon a non-mandatory item so long as there were any dispute as to mandatory topics."
 
 
 50
 Id. at 618 (citations omitted); accord, NLRB v. American Compress Warehouse, Division of Frost-Whited Co., 350 F.2d 365, 368-69 (5th Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472 (1966). Believing this case to be indistinguishable from Marine, I would affirm the Board's decision that these unfair labor practices contributed in a substantial way to the strike. See also NLRB v. Juniata Packing Co., 464 F.2d 153 (3d Cir. 1972); NLRB v. Cast Optics Corp., 458 F.2d 398 (3d Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972).
 
 
 51
 As a remedy for the violation, the Board directed reinstatements and back pay. The record shows that the company persisted in its position until February 1978, some six months after the strike began. It then withdrew its insistence on the two nonmandatory subjects, but the strike continued for another two months. The Board decided that the strike as a whole was noneconomic and directed reinstatement for that reason. Until the company changed its position in February, there is substantial evidence to support the Board's conclusion that the strike was noneconomic. It is arguable, however, that after the company dropped its insistence upon nonmandatory subjects in February, the character of the strike changed. I offer no view at this time as to whether the company's change in position limited the relief the Board could have imposed.
 
 
 52
 Because I believe there was substantial evidence that the employer forced an impasse on nonmandatory subjects of bargaining, I dissent from the majority opinion.
 
 
 
 [1]
 The June 21 charge cited the Company for insisting on having stenographers present and on making the transcripts available to any employee. This charge was amended by the December 20 charge which eliminated references to the availability of the transcript
 
 
 [2]
 Stenographers were also present at almost all of the sessions subsequent to the strike
 
 
 [3]
 In St. Louis Typographical Union, No. 8, 149 N.L.R.B. 750 (1964), the Board traced the development of the stenographer issue following the case of Reed & Prince Mfg. Co., 96 N.L.R.B. 850 (1951), which had treated the company's insistence on stenographers as evidence of bad faith
 In subsequent decisions, the legality of insisting upon a stenographic transcript at bargaining session has been determined in light of the entire bargaining context rather than on a per se basis. Similarly, in cases dealing with charges of a refusal to bargain arising from adamant insistence on other conditions preliminary to actual bargaining, such as the determination of the time or place of bargaining, the Board has avoided establishing rigid standards favoring any particular proposal, but has, rather, attempted to examine each case in terms of whether or not the positions were taken to avoid or frustrate the legal objection to bargain.
 
 
 [149]
 N.L.R.B. at 751-52 (footnote omitted)
 
 
 [4]
 The Company argues that we should not accept the Board's new position because it failed in Bartlett-Collins to explicitly overrule its prior line of cases. See West Sand & Gravel, 87 C.C.H. P 11,800, n.8 (1st Cir. 1979). Without passing on the necessity of explicitly "overruling," we note that the Company's contention is belied by the Board's statement in Bartlett-Collins that stenographers are a non-mandatory subject of bargaining and "(p)rior Board decisions indicating to the contrary are hereby overruled." 237 N.L.R.B. at 773
 
 
 [5]
 The Company contests the retroactivity of the Board's order and urges its reliance on the prior position of the Board only insofar as it relates to the imposition of the Board's "extraordinary remedies concerning reinstatement and back pay." Since we deny enforcement of the orders for reinstatement and back pay on other grounds, we need not consider the issue further. Moreover, in the absence of the orders for reinstatement and back pay, the sole effect of the finding of this unfair labor practice is the issuance of a cease and desist order. The only effect of this order in this case is to prevent similar activity in the future. Accordingly, we can find no hardship to the Company from the Board's retroactive change in position. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974); SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); Retail Wholesale & Department Store Union v. NLRB, 466 F.2d 380, 389-90 (D.C.Cir.1972)
 
 
 [6]
 The ALJ's decision notes that the introduction of stenographic reporters into conference room is itself disruptive of bargaining
 
 
 [7]
 It is, of course, clear that in a case where the parties insist on conflicting positions, the dispute must be resolved in some way. First, the appropriate action would be a finding of unfair labor practices, followed by cease and desist orders, on both parties. If this fails to break the deadlock, it may well then fall upon the Board to settle the issue by examining the totality of circumstances in the case
 
 
 [8]
 This reliance was necessary, due to the absence of direct evidence that the Company made the acceptance of the non-mandatory proposals conditions precedent to any agreement. While it was shown that the Company's position on those proposals was frequently reiterated and did not change from June 7, 1977, until February 6, 1978, when they were withdrawn, there was nothing to indicate that the Company conditioned bargaining on their acceptance. It is well-settled that a party has a right to propose, even repeatedly, non-mandatory subjects. See Borg-Warner, 356 U.S. 342 at 349, 78 S.Ct. 718 at 722; Oil, Chemical & Atomic Workers Local 3-819, 405 F.2d at 1117; Philip Carey, 331 F.2d at 727
 
 
 [9]
 Nor are we bound by the dictum of the Marine & Shipbuilding Workers case which stated "(a)ny other rule would permit insistence upon a non-mandatory item so long as there were any disputes as to mandatory topics." Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615, 618 (3d Cir. 1963) (emphasis added), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). Any dispute on a mandatory subject is not sufficient to protect a party's insistence to the point of impasse on a non-mandatory subject. The dispute over the non-mandatory subject must itself rise to the level of impasse
 
 
 [10]
 Because of our resolution of this issue it is unnecessary to consider the impact of the language of NLRB v. Stackpole Carbon Co., 105 F.2d 167 (3d Cir.), cert. denied, 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506 (1939), that "the burden rested upon (the company) to show that the strike would have taken place (even in the absence of the unfair labor practice)." Id. at 176; see Simmons, Inc. v. NLRB, 315 F.2d 143, 146-48 (1st Cir. 1963); Larand Leisurelies v. NLRB, 523 F.2d 814, 820 (6th Cir. 1975)